Darren G. Reid (#11163)
Engels Tejeda (#11427)
Ben Passey (#19324)
HOLLAND & HART LLP
222 S. Main St., Suite 2200
Salt Lake City, UT 84101
Telephone: (801) 799-5800
Facsimile: (801) 799-5700
Email: dgreid@hollandhart.com
        ejtejeda@hollandhart.com
        bdpassey@hollandhart.com

Erik F. Stidham (*Admitted Pro Hac Vice*)
Robert A. Faucher (*Admitted Pro Hac Vice*)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-7714
Telephone: (208) 342-5000
Email: efstidham@hollandhart.com
        rfaucher@hollandhart.com

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In Re: | Bankruptcy Case No. 24−23530 WTT |
| AMMON EDWARD BUNDY, | Chapter 7 |
| Debtor. | Honorable William T. Thurman |
| ST. LUKE'S HEALTH SYSTEM, LTD., ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., CHRIS ROTH, NATASHA D. ERICKSON, M.D., and TRACY W. JUNGMAN, NP, | Adversary Proceeding No. _____ |
| Plaintiffs, | |
| v. | |
| AMMON EDWARD BUNDY, | |
| Defendant. | |

## COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

St. Luke's Health System, Ltd., St. Luke's Regional Medical Center, Ltd., Chris Roth, Natasha D. Erickson, M.D., and Tracy W. Jungman, NP (collectively "Plaintiffs" or the "St. Luke's Parties") file this Complaint to Determine Non-Dischargeability of Debt and respectfully allege as follows:

## I.     PRELIMINARY STATEMENT

1.      In August 2023, the St. Luke's Parties became Ammon Bundy's judgment creditors after a jury awarded them over $50 million in damages arising from Bundy's and his co-conspirators' intentional wrongdoing (defamation, invasion of privacy, intentional infliction of emotional distress, violations of the Charitable Solicitation Act, and punitive damages).

2.      The claims arose from Bundy's and his co-conspirators' intentionally false narrative accusing the St. Luke's Parties of heinous crimes against children, inciting Bundy's armed followers to disrupt the hospital's operations, purposely damaging the Plaintiffs' reputations, and intentionally inflicting emotional distress.

3.      The judgment against Bundy was a default judgment. The district court referred the questions of causation and damages to the jury in a two-week trial. The district court also granted the St. Luke's Parties' motion for permanent injunctive relief and entered its own, independent findings of fact and conclusions of law based on the trial evidence.

4.      The prior proceedings have established the necessary elements under 11 U.S.C. § 523. Bundy acted willfully and maliciously. The judgment debt is not dischargeable.

## II.     PARTIES

5.      At all times relevant hereto, Plaintiff St. Luke's Health System, Ltd. ("SLHS") was and is a not-for-profit corporation doing business in Idaho with its principal places of

business in Ada County, Idaho. SLHS was a plaintiff in the action *St. Luke's Health System, Ltd.,*
*et al. v. Ammon Bundy et al.*, Case No. CV01-22-6789, in the Fourth Judicial District Court of
Idaho, County of Ada (the "2022 Lawsuit").

6.      At all times relevant hereto, Plaintiff St. Luke's Regional Medical Center, Ltd.
("SLRMC") was and is a not-for-profit corporation doing business in Idaho with its principal
places of business in Ada County, Idaho. SLRMC was a plaintiff in the 2022 Lawsuit.

7.      At all times relevant hereto, Plaintiff Mr. Roth was and is President and CEO of
SLHS. Mr. Roth was a plaintiff in the 2022 Lawsuit.

8.      At all times relevant hereto, Plaintiff Dr. Erickson was and is a physician
specializing in pediatric medicine. She is an employee of SLRMC. Dr. Erickson was a plaintiff
in the 2022 Lawsuit.

9.      At all times relevant hereto, Plaintiff NP Jungman was and is a nurse practitioner
specializing in pediatrics. She is an employee of SLRMC. NP Jungman was a plaintiff in the
2022 Lawsuit.

10.      Defendant Ammon Edward Bundy is a resident of Utah. Bundy is the debtor in
the above-captioned bankruptcy case. Bundy, then an Idaho resident, was defendant in the 2022
Lawsuit. Ammon Bundy is referred to herein as "Bundy" and/or "Debtor."

### III.      JURISDICTION AND VENUE

11.      This Court has jurisdiction to determine nondischargeability under Section 523
of Title 11 of the United States Code (the "Bankruptcy Code") and Sections 157 and 1334 of
Title 28 of the United States Code. This adversary action is a core proceeding pursuant to
Section 157(b)(2)(I) of Title 28 of the United States Code and relates to the petition of Debtor

Bundy (Case No. 24−23530 WTT) under Chapter 7 of the Bankruptcy Code. Plaintiffs consent

to entry of final order(s) of judgment by this Court. Plaintiffs commence this adversary

proceeding pursuant to Rules 4007, 7001(6), and 7001(9) of the Federal Rules of Bankruptcy

Procedure.

12.      Venue is proper in this district pursuant to Sections 1408 and 1409(a) of Title 28

of the United States Code.

## IV.     <u>FACTUAL BACKGROUND</u>

### A.     <u>The Events Leading to the 2022 Lawsuit</u>

13.      In March 2022, law enforcement determined that an infant (the "Infant") was in

imminent danger and brought the Infant to SLRMC's emergency room in Meridian, Idaho. The

lead emergency department physician diagnosed the Infant with severe malnourishment and

dehydration.

14.      Bundy, who had officially commenced his campaign for Governor of Idaho

earlier that week, took advantage of the publicity opportunity the situation presented. He

threatened that if the Infant were not immediately returned, there would be "hell to pay." He

incited a group from his militia, the People's Rights Network ("PRN"), to block the ambulance

bay in growing numbers, requiring incoming ambulances to be diverted. He had supporters of

Ammon Bundy for Governor (the "Campaign") film his arrest for trespass and immediately push

content to social media accounts and the official campaign website to promote his candidacy.

15.      The Infant was admitted to St. Luke's children's hospital in Boise for intensive

medical treatment. Bundy, working with his co-conspirators PRN, the Campaign, his acolyte

Diego Rodriguez, and Rodriguez's entities Freedom Man Press, LLC ("FM Press") and Freedom

Man PAC ("FM PAC"), repeatedly spread the intentionally false narrative that the St. Luke's

Parties' care of the Infant was actually part of a conspiracy with state agencies to commit child

trafficking, kidnapping, and other heinous crimes. Bundy and his co-conspirators published the

names and personal information of (now judgment creditors) Roth, Erickson, and Jungman to

threaten and intimidate them.

16.     Bundy incited an armed mob of hundreds to surround the St. Luke's hospital in

Boise to attempt to take the Infant by force. The crowds of his followers, fueled by the false

narrative, posed such a threat that a lockdown was necessary for the safety of patients, patients'

families, and hospital employees, notwithstanding the assistance from the Boise Police

Department and Idaho State Police. Armed individuals attempted to enter the hospital even after

it was locked down.

17.     Bundy and his co-conspirators also directed callers to flood St. Luke's with calls

for the purpose of shutting down the hospital's operations. His followers obeyed, overwhelming

critical phone lines with menacing calls including death threats and threats of sexual violence.

18.     Through intensive medical efforts, the Infant began gaining weight, and the risk

of imminent harm dissipated. The Infant was discharged from the children's hospital into

Department of Health and Welfare temporary care.

19.     Bundy and his co-conspirators continued to promote the false conspiracy theory

accusing the St. Luke's Parties of crimes against children. Bundy did this for his own benefit,

appearing on dozens of extremist alternative media broadcasts to promote his personal brand,

raise money, and gain more members in PRN by republishing the conspiracy theory. The online

posts about the conspiracy theory on FM Press solicited donations ostensibly for the Infant's

family's medical bills, even though they had incurred no medical expenses for the Infant's

treatment.

20.     Bundy's intentional actions caused significant harm to the St. Luke's Parties, in

the form of canceled appointments, increased security, reputational harm, emotional distress, and

other losses. Bundy intended the St. Luke's Parties to suffer these harms, as demonstrated by his

own admissions and other evidence.

21.     Bundy continued his misinformation campaign against the St. Luke's Parties

long after the lockdowns and the Infant's reunification with family.

**B.     The 2022 Lawsuit**

22.     On May 11, 2022, the St. Luke's Parties initiated the 2022 Lawsuit in the Fourth

Judicial District Court of Idaho, Ada County, *St. Luke's Health System, Ltd., et al. v. Ammon*

*Bundy, et al.* In addition to Bundy, the St. Luke's Parties filed suit against the PRN, the

Campaign, Rodriguez, FM Press, and FM PAC.

23.     The 2022 Lawsuit pursued claims for defamation, invasion of privacy,

intentional infliction of emotional distress, civil trespass, and violation of the Idaho Charitable

Solicitation Act. The St. Luke's Parties sought compensatory and punitive damages.

24.     The district court entered default against Bundy. He did not file anything in the

2022 Lawsuit, although he made many public statements about it on YouTube and via other

online channels. Bundy's co-defendants were also defaulted.

25.     Pursuant to Idaho default procedure, the St. Luke's Parties had the burden to

prove the existence and amount of damages before default judgment could be entered. In July

2023, these issues were decided by a jury in a two-week trial.

26.     At trial, the jury heard ample evidence that:

a.     Bundy issued the call to action to mobilize PRN's more than 60,000

members to rapidly respond in a coordinated fashion to disrupt St. Luke's

operations in March 2022. He also put calls out on his YouTube channel

and via text messages to the PRN network to prompt PRN members to

overwhelm St. Luke's phone lines. He coordinated with co-conspirators to

spread the false narrative far and wide. Plaintiffs presented direct evidence

of the threatening nature of Bundy's followers' phone calls and messages,

including death threats.

b.     Bundy hosted a town hall on May 10, 2022 and another event on May 26,

2022 to increase public attention for himself. Bundy repeated the fictional

conspiracies and encouraged members of PRN to continue to disrupt St.

Luke's operations and threaten and harass its staff and employees,

including the Plaintiffs. The jury heard about how Bundy, as the leader of

PRN, coordinated an attack to dox, intimidate, scare, harass, and threaten

St. Luke's, its staff and patients. The jury was provided direct evidence of

the foregoing acts in the form of Bundy's livestreams and videos posted

by him on the internet.

c.     Bundy advocates the use of violence to advance his own objectives of

imposing his desired type of Christian national government on other

people. Evidence showed that Bundy worked to accomplish his objectives

through the harassment, intimidation, threats of violence, and doxxing of

Plaintiffs—figures he specifically identified as standing in the way of his

agenda. The jury heard expert testimony that, in the case of the Infant,

Bundy expressed his agenda as a common fight to defend the rights of the

parents, but, in reality, he engaged in purposeful disruption and knowingly

put the security of Plaintiffs, other hospital employees and staff, patients,

patients' families, and others at risk.

d.    The Infant's medical records clearly showed Dr. Erickson, NP Jungman,

and all of the medical providers from St. Luke's who treated the Infant

exercised sound medical decision-making, made necessary evaluations

and interventions, correctly diagnosed and treated the Infant's conditions,

and met applicable standards of care.

e.    Bundy's repeated public statements that the Infant was healthy, that Dr.

Erikson misdiagnosed him, and that the Infant did not receive proper and

necessary care from St. Luke's were knowing falsehoods Bundy designed

specifically to inflame the emotions of the public and cause harm to St.

Luke's and its providers' reputations, all for his own political and

economic gain.

f.    Bundy engaged in doxxing the St. Luke's Parties. Doxxing is the

publication of sensitive personal information of people to encourage

others to harass and intimidate them at their homes and places of work.

Doxxing often results in an individual receiving threatening phone calls,

emails, and can result in that individual becoming an actual target of
violence.

g.   Bundy intentionally amplified his false messages and the harm to
Plaintiffs by repeatedly spreading lies about Plaintiffs on social media
accounts and websites he controlled. He used this misinformation
campaign to benefit himself financially and reputationally as he ran for
Governor of Idaho and sought to build the PRN's membership.

h.   Bundy launched a coordinated corporate attack that started in March 2022
and continued through the course of the lawsuit that specifically targeted
St. Luke's hospital's reputation and the reputation of its caregivers to
disrupt St. Luke's work and with the intent of damaging St. Luke's and its
providers' reputations, which impacted the community's trust in St.
Luke's.

i.   Bundy, in concert with the other defendants, used an intentional and
sophisticated strategy of sharing their false and defamatory information
across different internet platforms to create a lasting, yearslong impact.
Testimony also proved that Bundy and his co-defendants were aware that
St. Luke's could not share the truth about the Infant's medical condition or
treatment under HIPAA, and purposefully exploited that fact when
disseminating false information about the Infant's health and care.

j.   Bundy profited both politically and economically from his defamation of
Plaintiffs.

27.     On July 24, 2023, the jury awarded $52 million in compensatory and punitive damages arising from the claims for defamation, invasion of privacy, intentional infliction of emotional distress, and violation of the Idaho Charitable Solicitation Act.

28.     Due to the existence of a civil conspiracy among Bundy and the other defendants, liability for the entirety of the judgment was joint and several.

29.     On August 25, 2023, the district court granted the St. Luke's Parties' motion for permanent injunction, entering findings of fact and conclusions of law ("Findings and Conclusions"). The Findings and Conclusions are attached hereto as **Exhibit A**.

C.      **Key Findings and Conclusions**

30.     The facts necessary for this Court to determine that Bundy's debt to Plaintiffs is not dischargeable were conclusively and finally established in the 2022 Lawsuit.

31.     Among other things, the district court found:

a.      "The intentional, materially false and malicious defamatory statements by the Defendants include, but are not limited to, the following:

[i]     The Infant was perfectly healthy when taken by CPS.

[ii]    St. Luke's made the Infant sick and infected the Infant with disease.

[iii]   The Infant was kidnapped or unlawfully taken by law enforcement or St. Luke's.

[iv]    St. Luke's, St. Luke's management, law enforcement, DHW, the courts, and the medical practitioners are all involved in a

conspiracy to engage in criminal child trafficking, kidnapping, children and stealing children to make money.

[v]      The medical providers are pedophiles who want to abuse children and engage in child trafficking.

[vi]     DHW makes more money for every child it takes into CPS custody and that is why DHW kidnaps and traffics children and only allows certain people with a specific sexual orientation to adopt children.

[vii]    St. Luke's and the medical practitioners intentionally or negligently harmed or injured the Infant, committed medical malpractice and/or misdiagnosed the Infant.

[viii]   St. Luke's reported the parents to CPS.

[ix]     Dr. Erickson threatened to file a report with CPS if the parents did not agree to the treatment plan between March 1-4, 2022.

[x]      St. Luke's intentionally kept the Infant longer than necessary in the hospital because the parents did not want the Infant vaccinated.

[xi]     The family was discriminated against because the Infant was unvaccinated.

[xii]    The parents have thousands of dollars in medical bills they have to pay based on the care provided by St. Luke's or any medical provider.

[xiii]    The parents did not consent to the medical treatment provided to the Infant.

[xiv]   The Infant was released from the Children's Hospital and returned

directly to the family due to the protesters' or Defendants',

actions." Findings and Conclusions, pp. 19-20, ¶ 73.

b.    "The defamatory statements by the Defendants were completely

unfounded, false, made intentionally, and maliciously harmed the

reputations of the Plaintiffs and others who were doxxed. These false

statements invaded the privacy of Plaintiffs Mr. Roth, Dr. Erickson and

NP Jungman by portraying them in a false light as persons who harm

children. The defamatory statements and conduct of the Defendants

intentionally inflicted emotional distress on Plaintiffs Mr. Roth, Dr.

Erickson and NP Jungman as well as other parties who were doxxed and

threatened." *Id.*, pp. 20-21, ¶ 76.

c.    "Defendants' statements were intended to damage the reputations of the

Plaintiffs; invade the privacy of Mr. Roth, Dr. Erickson, and NP Jungman;

to shut down St. Luke's Hospital; and to threaten harm to those involved

in the CPS case involving the Infant." *Id.*, p. 14, ¶ 57.

d.    "Bundy . . . used the tactic of 'public shaming' through false and

defamatory narratives to intimidate and defame the Plaintiffs. This

included but was not limited to accusing the Plaintiffs of kidnapping, child

trafficking, child abduction, abusing children, and stealing children for

money and pedophilia. This intimidation also included releasing private

information about Mr. Roth, Dr. Erickson and NP Jungman which put

these Plaintiffs and their families at risk of harm as testified to at trial."

*Id.*, p. 15, ¶ 59.

e.   "Bundy directed his followers to be ready to 'fight it out on the street.'

Bundy . . . created a false and defamatory conspiracy theory against the

Plaintiffs and repeated it over and over again in an effort to have St.

Luke's put out of business and the medical providers to lose their jobs."

*Id.*, p. 16, ¶ 63.

f.   "The false and defamatory statements were made as part of a tactical and

sustained marketing campaign to defame and smear the reputations of the

Plaintiffs, incite unlawful conduct by Defendants' followers, create a fear

of future physical harm to Plaintiffs, and to create an incentive for

followers to make donations to Defendants or organizations they

controlled." *Id.*, p. 24, ¶ 89.

32.   The trial court entered a final Default Judgment ("Final Judgment") on

August 29, 2023. The Final Judgment was in the amount of $51,928,306.20. This amount was

the $52,000,000 verdict, minus $625,000 from Mr. Roth's award due to Idaho Code § 6-

1604(3)'s punitive damages cap, plus certain attorneys' fees awards.

33.   After entry of the Final Judgment and before Bundy filed his Chapter 7 petition

("Petition") with this Court, the St. Luke's Parties took steps to collect from Bundy. These

efforts have included, among other things, obtaining title to real estate Bundy fraudulently

conveyed to a friend, executing on Bundy's shares in two corporations, and freezing bank

accounts. The value of these assets is presently unknown but estimated to be between $2,000,000 to $4,000,000.

34.    Bundy filed his Petition on June 17, 2024. With post-judgment interest and offsets for assets recovered through collection, the Final Judgment exceeded $50,000,000 as of the date of Bundy's Petition.

## V.    CAUSE OF ACTION

### (Declaratory Judgment that Bundy's Debt to the St. Luke's Parties Is Nondischargeable Under 11 U.S.C. § 523(a)(6))

35.    The St. Luke's Parties incorporate and reallege each and every allegation contained above as if fully set forth herein.

36.    Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or the property of another entity."  To establish "willful and malicious injury," a plaintiff must show "either an objective substantial certainty of harm or a subjective motive to cause harm" on the part of the debtor.

37.    The Findings and Conclusions establish that, as to all damages captured in the Final Judgment, there was an objective substantial certainty of harm arising from Bundy's conduct, including his conduct in conspiring with the other defendants to the 2022 Lawsuit. Additionally and alternatively, the Findings and Conclusions establish that Bundy had a subjective motive to cause harm to the St. Luke's Parties. The evidence presented at trial and the allegations of the complaint in the 2022 Lawsuit—established as true through default— additionally demonstrate the standard set forth in Section 523(a)(6).

38.    The Final Judgment is adjudicated and liquidated.

39.     Bundy's obligation to the St. Luke's Parties in the amount of $50,000,000 is

nondischargeable under 11 U.S.C. § 523(a)(6) because that debt is "for willful and malicious

injury[.]"

## VI.     PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment:

a)     Excepting from discharge Bundy's $50,000,000 indebtedness to the St. Luke's

Parties pursuant to 11 U.S.C. § 523(a)(6); and

b)     Granting Plaintiffs such other and further relief as this Court deems just and

proper.

Dated this 15th day of October, 2024.

HOLLAND & HART LLP


*/s/Engels J. Tejeda*
Darren G. Reid (#11163)
Engels J. Tejeda (#11427)
Benjamin D. Passey (#19324)
Erik F. Stidham (*Admitted Pro Hac Vice*)
Robert A. Faucher (*Admitted Pro Hac Vice*)

*Attorneys for Plaintiffs*

32675820_v4

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD; CHRIS ROTH, an individual; NATASHA D. ERICKSON, MD, an individual; and TRACY W. JUNGMAN, NP, an individual, <br><br> Plaintiff(s), <br><br> -vs- <br><br> AMMON BUNDY, an individual; AMMON BUNDY FOR GOVERNOR, a political organization; DIEGO RODRIGUEZ, an individual; FREEDOM MAN PRESS LLC, a limited liability company; FREEDOM MAN PAC, a registered political action committee; and PEOPLE'S RIGHTS NETWORK, a political organization and an unincorporated association, <br><br> Defendant(s). | Case No. CV01-22-6789 <br><br> FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR PERMANENT INJUNCTIVE RELIEF FOR PLAINTIFFS |

In Plaintiffs' Fourth Amended Complaint, Plaintiffs sought injunctive relief in additional to any damages awarded by the jury. The Defendants were allowed to participate in the jury trial on damages including jury selection, opening statements, cross-examination and closing arguments, but all Defendants failed to appear. After seven days of trial on the issue of damages, the jury awarded the Plaintiffs certain monetary relief on their claims. The equitable relief in the form of injunctive relief was not before the jury as injunctive relief is for the Court to decide.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF
- Page 1

Having reviewed the docket, the admitted facts in the Fourth Amended Complaint due to the Defendants' default in this lawsuit, and being informed by both the evidence presented in the trial on monetary damages as well as the jury's verdicts on the Special Verdict Form, the Court issues its Findings of Fact and Conclusions of Law on the request for permanent injunctive relief.

### Findings of Fact

These findings of fact are primarily based on the live testimony and exhibits presented at the jury trial on damages. The exhibits are extensive and set forth the specific "statements" of the Defendants through videos, internet postings, publications, etc. The statements speak for themselves as to who made or published the statement. The statements and publications are too numerous to repeat in this case, but each exhibit was testified to in Court and only the admitted exhibits were relied on by the Court.

The testimony on the underlying events as well as care of the C.A. (the "Infant") were relevant at trial to provide background and context regarding the conduct of the Defendants. These findings of fact are supported by the substantial and competent evidence provided by credible witnesses and exhibits admitted during the trial. The Court will generally refer to the nature of statements and the contents of the statements without citing all the exhibits to support each finding of fact. All exhibits admitted are part of the Court record in this matter.

1. The Plaintiffs brought this action in response to the Defendants' statements and publications made against the named Plaintiffs, the trespass that occurred on

St. Luke's[1] hospitals in Meridian and Boise. The events that started the interactions between Plaintiffs and Defendants centered on the medical care of the Infant.

2. Nurse Practitioner Nadia Kravchuk, the Infant's primary care provider (PCP) saw the ten month old Infant on or about March 1, 2022. The Infant was severely dehydrated and the parents said the baby was vomiting. The Infant had lost approximately 4 pounds since its six-month wellness visit.  NP Kravchuk's office was unable to provide the necessary care and IV to rehydrate the Infant in her office. The parents were directed to the St. Luke's Boise Hospital emergency room where the Infant could be rehydrated.

3. The Emergency Room (ER) doctor on duty at St. Luke's determined not only was the Infant severely dehydrated, but the Infant was suffering from severe malnutrition. The ER doctor consulted with the Pediatric Hospitalist on duty, Dr. Erickson, who agreed the Infant should be admitted. Dr. Erickson agreed with the ER doctor's diagnosis of severe malnutrition and dehydration. Dr. Erickson testified the condition of the Infant was dire and without proper medical intervention, the Infant was at risk organ failure and possible death. This was NOT a healthy baby when it arrived at the hospital on March 1, 2022.  The parents reported to Dr. Erickson that the Infant was doing well until about 7 months of age and then reoccurring vomiting started and such vomiting would continue for several days. *See*, Exhibit 1, page 12.

4. Dr. Erickson is Board-Certified in both General Pediatrics and Pediatrics Hospital Medicine. She a highly trained pediatric doctor. Dr. Erickson consulted with the parents regarding the condition of the Infant. The parents agreed to the care plan to rehydrate

---

[1] The Court will prefer to Plaintiffs St. Luke's Health System, Ltd. and St. Luke's Regional Medical Center Ltd. Collectively as "St. Luke's."

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF - Page 3

and increase caloric intake for the Infant recommended by Dr. Erickson. At no time did Dr. Erickson threaten the parents to call child support enforcement if the parents did not agree to the treatment plan.

5. The parents did not want the Infant vaccinated. No medical provider vaccinated the Infant and that preference of the parents was respected. There was testimony by Dr. Erickson and NP Jungman, the parents' decision not to vaccinate the Infant did not in any way impact the care plan for the Infant or the respect shown the parents.

6. Prior treatment medical records for the Infant's medical care since birth were not provided by the parents and could not be obtained by Dr. Erickson beyond NP Kravchuk's limited records. This led to some additional tests being run to rule out other potential causes for the Infant's condition. Dr. Erickson noted the Infant was failing to thrive.

7. With proper medical intervention and treatment, including IVs to rehydrate, bottle feedings as well as additional feedings through a nasogastric feeding tube (NG tube), the Infant's medical condition improved.

8. Dr. Erickson arranged for St. Luke's staff and social worker to assist parents apply for and receive Medicaid so there would be no out-of-pocket cost to the family for the Infant's care. The family had no medical bills that were not paid by Medicaid for the Infant's care.

9. Dr. Erickson also arranged for a home health nurse to come to the Infant's home to check on the progress of the child and to help with any further needs for the child and family members caring for the child. Dr. Erickson explained, and the parents seemed to understand, that continuing the additional caloric intake was critical as the feeding

plan being used prior to the hospitalization was insufficient to allow the Infant to grow and thrive. Regular weight check-ins were also critical for determining if the Infant was or was not continuing with gaining weight as he had done in the hospital. The parents were trained on how do complete additional feedings via the NG tube. The parents were also advised to continue breast-feeding the Infant in addition to the other necessary feedings.

10. On March 4, 2022, the Infant's medical condition had improved to where the Infant could be cared for at home and the Infant was released to the parents with discharge instructions and verbal commitments by the parents they would comply with the instructions and call if they had questions or needed any further assistance.

11. The parents did not follow the discharge instructions for care for the Infant. Nor would the parents allow the home health nurse to come to their home to check on the Infant on March 5, 2022 or March 6, 2022.

12. Finally, on March 7, 2022, the parents took the Infant to NP Dkystra (who was not a St. Luke's medical provider but who St. Luke's had connected the family with as he would be able to assist with the NG tube and NP Kravchuk indicated she was not able to provide that level of care for the Infant). At this appointment, the Infant's weight had dropped since it was released from the hospital. NP Dkystra advised the parents how to increase caloric intake and set another appointment for March 11, 2022 to check the Infant's weight.

13. On March 11, 2022, the parents missed bringing the Infant to the scheduled appointment.

14. On March 11, 2022, NP Aaron Dkystra (not any doctor, NP or staff member of St. Luke's) called Department of Health and Welfare Child Protection Services (CPS) regarding his concern about the Infant and requesting a check on the child to make sure the weight of the Infant was not continuing to drop and thus endangering the Infant's life. NP Dkystra had a statutory duty to report his concerns regarding medical neglect by the Infant's parents.

15. A Department of Health and Welfare (DHW) Safety Assessor was assigned to the case. She also made contact with NP Jungman and law enforcement who regularly assist with investigation and welfare checks on children.

16. Going into a weekend, the need to have the Infant's status checked became a greater concern for the Infant's well-being. The DHW Safety Assessor came to Ms. Jungman's office to discuss the referral regarding the Infant. NP Jungman reviewed limited medical records. The DHW Safety Assessor could not reach the Infant's parents. NP Jungman said she would stay at work to see the Infant if parents would bring the Infant in.

17. NP Jungman has been a nurse or nurse practitioner for over 24 years. She is highly skilled based on her studies and work experience. She specializes her practice in providing clinical care and evaluation of children. She has also been trained in and has extensive experience in CPS process.

18. On March 12, 2022, the parents called and indicated they would take the child to St. Luke's Children at Risk Evaluation Services (commonly referred to by its acronym CARES unit) for a weigh-in and wellness check at 4:00 p.m. The parents never arrived for the appointment.

19. Detective Fuller of the Meridian Police Department consulted with Nurse Practitioner Jungman at CARES about what to look for when they were able to put eyes on the Infant to determine if the Infant was or was not doing well. Detective Fuller is experienced at CPS investigations and is trained in the legal standard necessary to remove a child from his or her parents' care.

20. Law enforcement attempted contact with the parents to check on the Infant at the home address provided. Defendant Rodriguez answered the door and would not let law enforcement check on the child.

21. Later that evening, law enforcement was able to track parents down in a vehicle and initiated a traffic stop to investigate the CPS referral and check on the Infant's welfare.

22. Defendants had communicated with their followers and had a large number of persons arrive at the gas station where the traffic stop occurred.

23. With the Infant being held by its mother, Detective Fuller did a welfare check on the child. The NG tube was no longer in place. The Infant presented with symptoms and observations indicating it was not doing well and was in imminent danger. The Infant and his mother were taken to the ambulance.

24. In the ambulance, the Infant was removed from the mother due to Detective Fuller's determination the Infant was in imminent danger. Detective Fuller completed the paperwork to take the Infant into the custody of DHW and to get the Infant transported to the nearest ER.

25. The Emergency Medical Technicians at the scene determined the Infant was "medically stable to transport." "Medically stable to transport" status is not the same as a patient

being medically stable and healthy and in no need of further medical care. It is simply a determination it is safe to transport the patient in the ambulance to the hospital.

26. The Infant was transported to the closest hospital, St. Luke's Meridian hospital, by ambulance.

27. At the ER, Dr. Rachel Thomas examined the Infant. She is a Board-Certified Emergency Room doctor who also has extensive medical experience and training involving children, including treatment of malnutrition and dehydration. Dr. Thomas also determined the Infant was in imminent danger/harm and needed a higher level of care that could be provided at the St. Luke's Children's Hospital at the main St. Luke's hospital in Boise.

28. Even after a bottle feeding in the ER in which the Infant gulped down 6 ounces of formula, Dr. Thomas noted the Infant's weight was less than the weight when the Infant left the St. Luke's Children's Hospital on March 4, 2022. Dr. Thomas diagnosed the Infant with severe malnutrition and dehydration that could lead to death if not immediately addressed.

29. Dr. Thomas testified that the defamatory statements and postings about her by the Defendants have led to emotional stress such that she is taking a break from medicine and leaving the community with her family for an extended period of time. It is her hope she will able to return and actively continue her medical career.

30. Defendant Bundy arrived at St. Luke's Meridian and with others blocked the ambulance bay from other ambulances being able to come to the hospital. Bundy was demanding release of the Infant even though he was not a family member or guardian of the Infant.

31. The protesters grew in number. The Meridian Police were called. The access doors to the ambulance bay were locked. Bundy was eventually trespassed from the private property of St. Luke's and was arrested along with another person engaged in the protests in the ambulance bay.

32. With active protesting occurring at the ER, Dr. Thomas consulted with hospital security and the Meridian Police Department and had the Infant safely transported to the Children's Hospital after determining the Infant was medically stable to be transported.

33. Dr. Thomas called Dr. Erickson and asked to have the Infant admitted. Dr. Erickson agreed to the admission and immediately went to the hospital to assist with the admission of the Infant to St. Luke's Children's Hospital and to begin further treatment.

34. Even though the Infant was in the custody of the DHW, St. Luke's medical professionals informed the parents of the care plan and the parents consented to all treatment provided by Dr. Erickson as well as by the other Pediatric Hospitalists caring for the Infant.

35. Dr. Erickson confirmed the Infant had in fact lost significant weight[2] since its release on March 5, 2022. Another NG tube was placed, and feedings and hydration began on the Infant.

36. Other Pediatric Hospitalists also provided care for the Infant when Dr. Erickson was not on duty.

---

[2] It is important to note that while the amounts of weight loss or gain in this case may not "sound" significant, for the age and size of the Infant in this case and where the Infant was measured at being on the growth chart (in lower than 0.5% of all infants this age), the weight loss was significant and could lead to organ failure and death.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF
- Page 9

37. NP Jungman also consulted with the Pediatric Hospitalists and participated in the phone and in-person communications with the parents during the time the Infant was at the Children's Hospital. She also stayed involved in the care when the Infant was released to DHW's caregiver.

38. The parents were regularly updated by St. Luke's employees about the Infant's status and were allowed to visit and hold the Infant for approximately two hours at the hospital on or about March 13, 2022. Other visits and communications also occurred while the Infant was at the Children's Hospital.

39. While the Infant was being treated at the Children's Hospital, the Defendants Bundy and Rodriguez, in conjunction with multiple communications sent out by the other Defendants, organized protestors at St. Luke's Boise Hospital. The protests involved hundreds of people including people armed with weapons. Defendant Rodriguez made statements on March 14, 2022 that the Infant was being abused and mistreated by St. Luke's.

40. On March 12, 2022, the Defendants and followers of the Defendants were instructed by Bundy, Rodriguez and the websites or communications from People's Rights Network (PRN) and Freedom Man Press LLC to disrupt the operations of the St. Luke's by jamming the phone lines complaining and demanding the release of the Infant.

41. Bundy and Rodriguez would not leave the private property of St. Luke's when asked. Boise Police and Idaho State Troopers were brought in to maintain the security of the hospital.

42. Eventually, the threat of risk of harm to patients, patients' families, employees and a breach of the hospital became too great and the hospital was forced into lockdown and to close the hospital to new patients.

43. Armed protesters and followers of the Defendants attempted to enter the hospital even after it was locked down.

44. After it was discovered that the Infant had been removed from the hospital, the protesters moved their demonstrations to DHW offices.

45. The Infant was doing better and was discharged from St. Luke's on March 15, 2022 to DHW custody. The parents were allowed more and more time with the Infant by DHW as part of the safety/reunification plan.

46. Through intensive medical efforts, the Infant began gaining weight and his risk of imminent harm was eliminated. The Infant required ongoing monitoring to make sure it was continuing to gain weight and thrive. Additional calories were being given via the NG tube by the Infant's caregivers.

47. DHW stayed in regular communication with CARES and the parents regarding care of the Infant. NP Jungman along with the Medical Director of CARES evaluated the Infant 3-4 times and the Infant was gaining weight.

48. On March 18, 2022, the parents called DHW as the feeding tube had inadvertently come out while the parents had care of the Infant as part of DHW's safety/reunification plan. The parents did not want to go to hospital or have the Infant seen at their home. The parents requested NP Jungman reinstall the NG tube. DHW arranged a place and time to meet the parents away from protesters who were at the main DHW office. NP

Jungman reinstalled the NG tube in the Infant, following applicable standards of care for such a procedure.

49. NP Jungman and the CARES Medical Director evaluated the Infant again on March 23, 2022 with the parents present. The follow-up weight check showed the Infant was continuing to progress. The Infant was more interactive than at previous visits. Home health and PCP care was discussed again with parents.

50. Dr. Michael Whelan, a Board-Certified Pediatrician who works at St. Alphonsus, testified he concurred in the diagnosis and all of the care provided to the Infant. He confirmed based on the medical records that the Infant was in imminent danger based on its dehydration and malnutrition and the Infant was failing to thrive. He further opined that all care provided met the standard of care and there was no medical malpractice or misdiagnoses by any medical practitioner and specifically not by either of the named plaintiffs, Dr. Erickson and NP Jungman. He opined the NG tube was necessary and appropriate both times at the hospital. He opined the discharge instructions from St. Luke's were appropriate. He opined the re-installation of the NG tube by NP Jungman was within the standard of care and did not cause any infection or disease to the Infant as the placement of the tube was into a non-sterilized location of the body, the stomach. He opined the re-installation of the HG tube did not cause an infection in the Infant.

51. Dr. Whelan also opined the parents of the Infant were "medically neglectful" for not following through on discharge instructions and with follow up visits for weight checks to make sure feedings were providing the Infant with sufficient caloric intake. Dr.

Whelan opined he believed the parents knew the Infant had lost weight after first time

Infant was released from hospital on March 4, 2022.

52. Dr. Whelan opined that, based on all the outside pressure by Defendants, St. Luke's,

Dr. Erickson and NP Jungman performed very well and there was no evidence that the

Infant was not improving while in the care of St. Luke's.

53. Based on the testimony of Kyle Bringhurst, the Ada County Deputy Prosecutor who

handled the Infant's case and has 8-9 years of experience involving CPS cases, the CPS

proceedings and requisite findings for placement into DHW custody occurred as

required by statute. A shelter hearing was held on March 15, 2022 and a mandatory

adjudicative hearing was set. A Notice of Dismissal by the State was filed on or about

May 4, 2022, so the adjudicatory hearing set for May was vacated. The Infant was

returned to the custody of the parents with a safety plan.

54. David Jeppesen, Director of the Department of Health and Welfare, also testified the

CPS process is defined by statute and was followed in this case. The courts, not the

DHW, decide if a child is allowed to return to his or her parents. The goal is to reunite

children with their parents and this goal in Idaho is achieved in about 65% of the CPS

cases (which is much higher than the national average).

55. Director Jeppesen also testified the DHW does not get "extra money" for placing a

child in the care of DHW per the CPS statute. The legislature sets the budget for the

DHW and there is no increase in monies to the DHW for children taken into temporary

custody under the CPS. Director Jeppesen also testified that allegations of child

trafficking or kidnapping are untrue. While there are some adoptions of children whose

parents are not fit to raise them, this is in accordance with Idaho's statutes and court

approval is required for all such adoptions. Finally, such adoptions do not happen frequently and there is no preference for persons of a particular sexual orientation as alleged by Defendants.

56. Immediately after the CPS referral was made and the Infant was removed from the parents, the Defendants Bundy and Rodriguez, through their own statements, video postings, communications with their followers and their internet postings on the websites of the other Defendants: Peoples Rights Network (PRN), Freedom Man Press, LLC and Ammon Bundy for Governor -- which Bundy and/or Rodriguez controlled-- began doxxing[3] and intimidating the Plaintiffs, other medical providers as well as anyone involved in the CPS matter (including but not limited to law enforcement, the prosecuting attorney, the judge handling the confidential CPS court proceedings, and the Safety Assessor for DHW).

57. Defendants' statements were intended to damage the reputations of the Plaintiffs; invade the privacy of Mr. Roth, Dr. Erickson, and NP Jungman; to shut down St. Luke's Hospital; and to threaten harm to those involved in the CPS case involving the Infant.

58. Defendants Bundy and Rodriguez are actively involved in and are spokepersons for PRN. Defendant Rodriguez controls and authors many of the statements posted on Defendant Freedom Man Press, LLC's website, which published Bundy and Rodriguez's defamatory statements on the internet and on other extremist media outlets. Bundy and Rodriguez hold themselves out to be anti-government activists motivated by certain religious beliefs. Bundy encourages militia-style training for his

---

[3] Doxxing includes publicly identifying or publishing private information about a person as a form of punishment or revenge.

followers. He urges his followers to take action outside the law to protect their rights. Defendants Bundy and Rodriguez, PRN and Freedom Man Press, LLC are willing to encourage others to join them in using violence to reach their objectives and to harass public employees such as law enforcement, DHW employees, CPS prosecutors, and judges.

59. Bundy and Rodriguez used the tactic of "public shaming" through false and defamatory narratives to intimidate and defame the Plaintiffs. This included but was not limited to accusing the Plaintiffs to be involved in kidnapping, child trafficking, child abduction, abusing children, and stealing children for money and pedophilia. This intimidation also included releasing private information about Mr. Roth, Dr. Erickson and NP Jungman which put these Plaintiffs and their families at risk of harm as testified to at trial.

60. PRN was a supporter of Ammon Bundy for Governor, and the events in this case were the topic of Bundy at political gatherings, and defamatory statements about Plaintiffs were made by Bundy at his political events and made for the indirect purpose of raising campaign contributions.

61. Spencer Forby, an expert on extremist organizations as well as a highly trained law enforcement officer and instructor on de-escalating situations, crowd control and SWAT techniques, opined that Defendants Bundy, Rodriguez, PRN and Freedom Man Press, LLC, used their defamatory statements and disinformation rhetoric to trigger their followers to a call for action based on false premises, which then led to Defendants Bundy and Rodriguez creating conspiracy theories of heinous criminal allegations by Plaintiffs without any factual basis. In order to maximize the involvement of the

Defendants' followers, there was a strategic coordination of the false and defamatory messages being repeated over websites controlled by Defendants and shared with other extremist media outlets.

62. Defendants' followers then quickly joined the protest at the hospital and the efforts outside Idaho to disrupt the business of St. Luke's by flooding the phone lines. The false and defamatory statements of Bundy and Rodriguez were then used by followers and the Defendants to harass and intimidate the Plaintiffs via verbal, in-person and online threats.

63. Bundy directed his followers to be ready to "fight it out on the street." Bundy and Rodriguez created a false and defamatory conspiracy theory against the Plaintiffs and repeated it over and over again in an effort to have St. Luke's put out of business and the medical providers to lose their jobs. The Plaintiffs testified they believed the statements presented real threats of violence to them personally as well as their families. Plaintiffs testified as to the specific steps they took as a result of the intimidation and defamatory statements to protect themselves and their family members. Plaintiffs also testified to having to daily track the social media of all the Defendants to weigh and prepare for threatened harm.

64. According to Jessica Flynn, an expert on reputational harm, and Beth Toal, St. Luke's Vice President for Communications, Bundy's and Rodriguez's tactics are deliberate and intentional. Their marketing techniques and use of social media have the effect of disseminating knowingly defamatory information and disinformation to radicalize their followers and at the same time get media coverage of their actions and raise monies for their organizations based on their defamatory statements. The Defendants wanted their

messages to go viral as well as deep and wide, and to have lasting effects. The
Defendants wanted their social media attack and protests to prevent St. Luke's from
providing services to others. The Defendants also created a clear connection in their
social media for contributions to support their conduct. The media recognition gained
by the Defendants through their disinformation and defamatory statements is intended
to raise their individual profiles as well as their organizations' profiles.

65. The extremist and marketing experts testified the Defendants also used the Infant being
taken into CPS custody to increase their own visibility on the internet and in the
community as well as to raise money for themselves through the organizations they
controlled. This conduct continues to the present and it is not expected to stop as it is a
source of fundraising for Bundy's and Rodriguez's organizations.

66. Defendants Bundy and Rodriquez organized and promoted the protests at St. Luke's.
These protests involved armed individuals, which is consistent with Bundy's
involvement in prior protests and his statements/trainings of his followers about the use
of force. The experts testified that the militia training promoted and offered by PRN
creates a threat and possible risk of physical harm.

67. On the advice of law enforcement, who indicated they could not restrain the number of
protesters (estimated to be 400 persons), St. Luke's was forced to lock down the entire
downtown campus and to redirect patients to other facilities.

68. The lockdown also prevented families from entering the hospital to see their loved
ones, prevented third parties from seeking care or attending a scheduled appointment
at the Boise campus, and prevented employees from coming or leaving their shifts.

69. St. Luke's Chief Financial Officer as well as Dennis Reinstien, CPA, testified that economically St. Luke's lost significant revenue from cancelled treatment or appointments. St. Luke's also incurred additional security costs during the protests and had to increase the number of individuals involved in security at all of its facilities to be prepared for future protests organized by the Defendants.

70. The Defendants knew or reasonably should have known the statements they were making were false and defamatory. Defendant Rodriguez is the grandfather of the Infant and the medical records provided to his daughter (mother of the Infant) easily could have been reviewed by him. Instead, he made false and defamatory statements regarding the health of the Infant, the actual medical care diagnoses and the care provided.

71. Rodriguez also claimed without any legal statutory support that the actions of the CPS were unlawful and was involved with a marketing plan for donations for the Infant and its family, as well as to monetize his and Bundy's organizations.

72. No evidence was presented that any of the Defendants have medical training, knowledge or education to support their false and defamatory statements regarding the Infant's health status and the need for medical care.

73. The intentional, materially false and malicious defamatory statements by the Defendants include, but are not limited to, the following:

    a.   The Infant was perfectly healthy when taken by CPS.

    b.   St. Luke's made the Infant sick and infected the Infant with disease.

    c.   The Infant was kidnapped or unlawfully taken by law enforcement or St. Luke's.

d. St. Luke's, St. Luke's management, law enforcement, DHW, the courts, and the medical practitioners are all involved in a conspiracy to engage in criminal child trafficking, kidnapping children and stealing children to make money.

e. The medical providers are pedophiles who want to abuse children and engage in child trafficking.

f. DHW makes more money for every child it takes into CPS custody and that is why the DHW kidnaps and traffics children and only allows certain people with a specific sexual orientation to adopt children.

g. St. Luke's and the medical practitioners intentionally or negligently harmed or injured the Infant, committed medical malpractice and/or misdiagnosed the Infant.

h. St. Luke's reported the parents to CPS.

i. Dr. Erickson threatened to file a report with CPS if the parents did not agree to the treatment plan between March 1-4, 2022.

j. St. Luke's intentionally kept the Infant longer than necessary in the hospital because the parents did not want the Infant vaccinated.

k. The family was discriminated against because the Infant was unvaccinated.

l. The parents have thousands of dollars of medical bills they have to pay based on the care provided by St. Luke's or any medical provider.

m. The parents did not consent to the medical treatment provided to the Infant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF
- Page 19

n. The Infant was released from the Children's Hospital and returned to directly to the family due to *the protesters'* or Defendants', actions.[4]

74. These false statements were repeated again and again by Defendants, including using links to the statements on other websites and video recordings. "Wanted" posters were made for Mr. Roth, Dr. Erickson and NP Jungman (as well as others involved who were doxxed) and posted on the internet as well as distributed at the protests at the St. Luke's Boise campus. The Plaintiffs and others involved in the events were repeatedly threatened by Defendants' actions of encouraging their followers to take action into their own hands and disclosing personal information about Mr. Roth, Dr. Erickson and NP Jungman. Phone messages to St. Luke's from followers across the county repeated the false and defamatory statements of Bundy and Rodriguez.

75. St. Luke's senior management officers testified it is now more difficult to recruit doctors and other medical providers to Idaho due to the events surrounding the Infant and the Defendants' harassment and defamatory statements towards St. Luke's and its employees.

76. The defamatory statements by the Defendants were completely unfounded, false, made intentionally, and maliciously harmed the reputations of the Plaintiffs and others who were doxxed. These false statements invaded the privacy of Plaintiffs Mr. Roth, Dr. Erickson and NP Jungman by portraying them in a false light as persons who harm children. The defamatory statements and conduct of the Defendants intentionally inflicted emotional distress on Plaintiffs Mr. Roth, Dr. Erickson and NP Jungman as

---

[4] The Infant was returned to its parents by the Court through the dismissal of the CPS case, not the actions of Defendants.

well as other parties who were doxxed and threatened. Mr. Roth, Dr. Erickson and NP Jungman all presented substantial and credible evidence of the actual harm they (and their families) suffered due to Defendants' defamatory statements, invasion of privacy and intentional infliction of emotional distress upon Plaintiffs by attacking their professional reputations.

77. Experts Devin Burghart, Spencer Fomby, and Jessica Flynn all testified that once on the internet, it is difficult to remove defamatory statements from the internet. In this case, the Defendants took steps to regularly re-post prior videos and postings and to create links to the false statements on the website of other media sources, thereby knowingly increasing the viewers of the published defamatory statements. The original posts as well as present statements continue on the Internet such as when Bundy or Rodriguez are quoted with links to other websites about this litigation. See Idaho Dispatch quotes and postings in the Declaration of Jennifer Jensen in support of the requested injunctive relief.

78. The extremist organization experts testified the defamatory statements are re-posted by the Defendants in order to keep them in the news and to generate new followers and more donations.

79. C.P. "Abby" Abbodandolo, Senior Director of Security for St. Luke's, who has extensive hospital security and law enforcement experience, testified he was shocked how quickly the Defendants could mobilize their followers to protest, make signs, and come armed and ready to take action. He also testified the Defendants and their followers create an ongoing threat to St. Luke's operations throughout the state.

80. The DHW Safety Assessor left DHW employment and moved out of state due to the doxxing. Dr. Thomas testified she is leaving and moving from the state for a period of time in hopes that she can safely return to practice medicine. Employees left St. Luke's employment due to the protesting and intimidation. Dr. Erickson has considered leaving a job she loves due to the ongoing emotional distress and intimidation of the Defendants. NP Jungman has suffered and continues to suffer from emotional distress, and the intimidation affects how she interacts with parents of other patients.

81. The extremist group experts Burghart, Fomby, and Flynn described both Bundy and Rodriquez as an anti-government activists, conflict disrupters, and disrupter entrepreneurs. Their business model is to raise money for themselves or the organizations they control from followers based on false, fraudulent and defamatory statements. The Defendants have used disinformation (misinformation that is intentionally spread) to harm Plaintiffs.

82. Dr. Camille LaCroix, Forensic Psychiatrist, testified as to the continuing emotional distress to Dr. Erickson and NP Jungman, and that this is not likely to go away and gets worse every time there is a new or a re-posting of a defamatory statement, an article or threat against them personally. Dr. Erickson's husband testified as to the need to continually monitor social media postings to make sure his wife and family are safe. According to Dr. LaCroix, Dr. Erickson and NP Jungman can be triggered and suffer more emotional distress by the re-posting of defamatory statements and invasions of their privacy that cause them to change how they treat others and how they protect their families.

83. Dr. Erickson and NP Jungman each testified that defamatory statements, harassment and intimidation as a result of Defendants' actions affects their life every day professional and in their personal relationships. Both testified as to the constant fear they have due to Defendants defamatory attacks in the newspapers, on tv, and on the internet.

84. The evidence provided at the jury trial was substantial and competent evidence that established the claims of defamation, invasion of privacy and intentional infliction of emotional distress due to the Defendants' conduct. These claims were satisfied by the applicable burden of proofs of preponderance and clear and convincing evidence.

85. As to the defamation claims, the Court finds:

    a.   The Defendants communicated information concerning the Plaintiffs to others;

    b.   The information impugned the honesty, integrity, virtue or reputation of the Plaintiffs or exposed the Plaintiffs to public hatred, contempt or ridicule;

    c.   The information was false;

    d.   The Defendants knew it was false or reasonably should have known that it was false; and

    e.   Plaintiffs suffered injury caused to the defamation.

86. As to the Invasion of Privacy claims, the Court finds:

    a.   The Defendants placed Mr. Roth, Dr. Erickson, and NP Jungman in a false light in the public eye by publicly disclosing some falsity or fiction concerning Mr. Roth, Dr. Erickson, and NP Jungman.

    b.   A disclosure of some falsity or fiction means that a publication or publications by

Defendants were materially false.

    c. Plaintiffs Mr. Roth, Dr. Erickson and NP Jungman suffered injury caused by the false light invasion of their privacy.

87. As to the Intentional Infliction of Emotional Distress claims, the Court finds:

    a. Defendants engaged in intentional or reckless conduct;

    b. That was extreme and outrageous;

    c. Causing severe emotional distress to Mr. Roth, Dr. Erickson, and NP Jungman; and

    d. Plaintiffs Mr. Roth, Dr. Erickson and NP Jungman were injured and the emotional distress was proximately caused by Defendants' conduct.

88. The Defendants' defamatory statements including allegations of conspiracy by the Plaintiffs, law enforcement, the courts and DHW to engage in criminal conduct against children is not supported by any evidence.

89. The false and defamatory statements were made as part of a tactical and sustained marketing campaign to defame and smear the reputations of the Plaintiffs, incite unlawful conduct by Defendants' followers, create a fear of future physical harm to Plaintiffs, and to create an incentive for followers to make donations to Defendants or organizations they controlled.

90. The Defendants actions in this case, as well as the fact that they refuse to stop making defamatory statements, repeat past defamatory statements, presents a continuing threat of actual irreparable harm to Plaintiffs. The continuing threat has led to St. Luke's increasing its security at each of its hospitals. The named Plaintiffs continue to be the subject of threats by Defendants or their followers. The threats include but are not

limited to personal, professional or family member harm through Defendants internet

presence and re-posting of prior defamatory statements.  A prior Protection Order by

the Court has failed to deter Defendants from making knowingly false and defamatory

statements and repeating such statements.

## Conclusions of Law

The Court requested supplemental legal support for Plaintiffs position they are entitled to

equitable relief in the form a permanent injunction. Plaintiffs file a memorandum and supplemental

brief and declaration in support of the request injunctive relief. In the Declaration of Jennifer M.

Jensen, she indicates the Idaho Dispatch (which is not a party to this lawsuit) continues to post

Defendant Rodriguez's and Bundy's defamatory statements about the Plaintiffs and counsel

involved in this case on the internet even after the jury trial on damages has ended. Defendant

Rodriquez filed an "Answer to Request for Permanent Injunctive Relief."[5] The Court has

considered the findings of fact and the entire court record including Rodgriguez's filings in making

its ruling on injunctive relief.

1.  **Whether or not to grant permanent injunctive relief is within the discretion of the**

   **trial court.**

---

[5] Defendant Rodriguez claims in part there has never been an evidence-based trial as to whether
or not the things he said were true and he believes all his statements were true. The Court notes
the jury trial was evidence-based (with testimony and admitted exhibits), but Defendant
Rodriguez elected not to attend and cross examine witnesses or challenge the admissibility of
evidence. Defendant Rodriguez also claims injunctive relief is a violation of his First
Amendment rights. For the reasons discussed in this Findings of Fact and Conclusions of Law,
the Court finds injunctive relief is allowed as a matter of law and appropriate in this case.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF
- Page 25

In *Gem State Roofing, Incorporated v. United Components, Incorporated*, 168 Idaho 820, 828, 488 P.3d 488, 496 (2021), the Idaho Supreme Court held "The granting or refusal of an injunction is a matter resting largely in the trial court's discretion." (*citing Higginson v. Westergard*, 100 Idaho 687, 689, 604 P.2d 51, 53 (1979). In applying its discretion, this Court must: (1) correctly perceive the issue as one of discretion; (2) act within the outer boundaries of its discretion; (3) act consistently with the legal standards applicable to the specific choices available to it; and (4) reach its decision by the exercise of reason. *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). The Supreme Court in *Gem State Roofing* went on to discuss the different standards for preliminary versus permanent injunctions:

> As an initial observation, UCI's reliance on the standard for a *preliminary* injunction is inapposite. Rule 65(e) enumerates five grounds for entry of a preliminary injunction. A preliminary injunction is a temporary injunction effective for the pendency of the litigation before the merits of the case are decided. I.R.C.P. 65(e). Preliminary injunctions are designed to protect clearly established rights from imminent or continuous violation during litigation. *See Gordon v. U.S. Bank Nat'l Ass'n*, 166 Idaho 105, 455 P.3d 374, 384 (2019) (quoting *Brady v. City of Homedale*, 130 Idaho 569, 572, 944 P.2d 704, 707 (1997)) ("A district court should grant a preliminary injunction 'only in extreme cases where the right is very clear and it appears that irreparable injury will flow from its refusal.'"). A permanent injunction, on the other hand, is entered at the resolution of the case, and requires a showing of threatened or actual irreparable injury; in addition, in order to deny a permanent injunction the trial court must be persuaded that there is "no reasonable expectation that the wrong will be repeated." *O'Boskey*, 112 Idaho at 1007, 739 P.2d at 306. In other words, a trial court may appropriately deny a preliminary injunction at the outset of a case when there are complex issues of fact and law yet to resolve, but correctly grant a permanent injunction once those issues have been resolved in favor of the plaintiff.

*Gem State Roofing*, 168 Idaho 820, 834–35, 488 P.3d 488, 502–03 (2021).

In this case, the Court finds based on the Findings of Fact and the Declaration of Jennifer Jensen, the Plaintiffs have established by substantial and competent evidence of threatened or

actual irreparable damage as well as a reasonable expectation that the wrong will be repeated by the Defendants if permanent injunctive relief is not granted.  The jury's monetary damages, if able to be collected, are inadequate to protect Plaintiffs from continued and ongoing injuries to their reputations, privacy, emotional health, ability to practice their chosen professions and reside in the community without fear, and to allow the community to trust that St. Luke's hospital system is not in any way engaged in heinous criminal conduct towards its patients. Balancing the hardships between Plaintiffs and Defendants' alleged chilling of their freedom of speech rights, the balance tips in favor of Plaintiffs. A remedy in equity is warranted as defamatory speech is not protected free speech. Finally, the public interest would not be disserved by a permanent injunction of the scope outlined in this decision. The permanent injunctive relief is appropriate to eliminate the ongoing irreparable threatened and actual harm to all Plaintiffs.

**2. Defendants' defamatory statements are not protected speech under the First Amendment.**

The United States is a republic founded on the doctrine of the rule of law. What that means is all persons are expected to follow the laws adopted through our representational form of government. It also means all persons, no matter their status, wealth or beliefs must follow the rule of law.

The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press or the right of the people to peacefully assemble, and to petition the Government for a redress of grievances.

However, these rights are not absolute. Every right under the Constitution is subject to limits, and a person or entity cannot make or publish knowingly false statements that intentionally cause reputational or other damage to another and then hide behind the First Amendment as a shield. The

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF
- Page 27

United States Supreme Court has recognized categories of speech that the government can regulate

because of the content of the speech, as long as the government does so evenhandedly. *See R.A.V.*

*v. City of St. Paul*, 505 U.S. 377 (1992) (categories of speech that are limited: obscenity,

defamation, fraud, incitement, fighting words, true threats, speech integral to criminal conduct,

and child pornography). In *R.A.V.* the Court stated:

> The First Amendment generally prevents government from proscribing speech, *see, e.g., Cantwell v. Connecticut*, 310 U.S. 296, 309–311, 60 S.Ct. 900, 905–906, 84 L.Ed. 1213 (1940), or even expressive conduct, *see, e.g., Texas v. Johnson*, 491 U.S. 397, 406, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342 (1989), because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991) id., at 124, 112 S.Ct., at 512–513 (KENNEDY, J., concurring in judgment); *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332–2333, 65 L.Ed.2d 319 (1980); *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289–2290, 33 L.Ed.2d 212 (1972). From 1791 to the present, however, our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky, supra*, 315 U.S., at 572, 62 S.Ct. at 762. We have recognized that "the freedom of speech" referred to by the First Amendment does not include a freedom to disregard these traditional limitations. *See, e.g., Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity); *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (defamation); *Chaplinsky v. New Hampshire, supra* (" 'fighting' words"); *see generally Simon & Schuster, supra*, 502 U.S., at 124, 112 S.Ct., at 513–514 (KENNEDY, J., concurring in judgment). Our decisions since the 1960's have narrowed the scope of the traditional categorical exceptions for defamation, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *see generally Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13–17, 110 S.Ct. 2695, 2702–2705, 111 L.Ed.2d 1 (1990), and for obscenity, *see Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), but a limited categorical approach has remained an important part of our First Amendment jurisprudence.
>
> We have sometimes said that these categories of expression are "not within the area of constitutionally protected speech," *Roth, supra*, 354 U.S., at 483, 77 S.Ct., at 1308; *Beauharnais, supra*, 343 U.S., at 266, 72 S.Ct., at 735; *Chaplinsky, supra*, 315 U.S., at 571–572, 62 S.Ct., at 768–769; or that the "protection of the First Amendment does not extend" to them, *Bose Corp. v. Consumers Union of United*

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF
- Page 28

*States, Inc.*, 466 U.S. 485, 504, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984); *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 124, 109 S.Ct. 2829, 2835, 106 L.Ed.2d 93 (1989).

*R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992).

Stated another way, defamation is a limit on both freedom of speech and freedom of the press. A person or entity cannot say "I believed what I was saying was true" when the undisputed facts establish those "truths" were known to be false or should have been known to be false by the Defendants and they were spoken with the specific intent to threaten or cause harm to the other person or entity.

The defamatory statements made by Defendants here were not just disagreements with the manner in which the CPS laws are enforced. Instead, the defamatory statements by Defendants were made intentionally to get others to believe "as true" that Plaintiffs and anyone else involved in the CPS investigation and court proceedings or medical treatment of the Infant were committing heinous acts against the Infant, and that St. Luke's and the other Plaintiffs were "wicked" and "evil" persons such that they should be removed from their professions and the hospital shut down from providing all medical care to anyone in our community. There is no evidence (only baseless allegations by Defendants) of any such conduct by the Plaintiffs or any other party involved in the CPS case involving the Infant. In a court of law, the party claiming truth as a defense must present evidence of truth, and Defendants did not do so.

Here, the Defendants' statements in every possible form were intentional and with reckless disregard for the truth, fraudulent, malicious and defamatory. As the jury instructions explained, defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander. The law is well-established that speech which is defamatory and causes harm is not protected by the First Amendment. As indicated in the above quote from the

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF
- Page 29

Supreme Court, defamation in our common law existed prior to the founding of this country and

has been recognized since 1791 by our courts. Further, the mere fact that religious beliefs are cited

as motivation for the Defendants' actions does prevent the statements from being defamatory or

illegal invasions of another's right to privacy.[6] Nor does the cloak of the Defendants' religious

beliefs that the Plaintiffs were "wicked" allow First Amendment protection to the statements such

that the statements cannot also be defamatory.

Additionally, the United States Supreme Court recently reaffirmed fraudulent statements

made to encourage or induce illegal immigration for financial gain are not protected speech under

the First Amendment. *See United States v. Hansen*, 2023 WL 4138994, __ U. S. __, 143 S.Ct.

1932 (2023). "Speech intended to bring about a particular unlawful act has no social value;

therefore, it is unprotected." *Williams*, 553 U.S. at 298, 128 S.Ct. 1830." *Id.* at 1947 (2023).

Defendants' conduct in this case included false, fraudulent and defamatory statements made in

part for their own financial gain and such speech is not protected. People are free to give money

to whatever organizations or persons they want, but they should be informed if the statements to

support such donations of monies are not true.

Finally, simply saying a statement over and over does *not* make it true. It is well-established

law that a person can tell certain lies and those lies are protected by the First Amendment. *See*

*United States v. Alvarez*, 567 U.S. 709 (2012) where an individual was being criminally prosecuted

for falsely claiming to have received a military medal of honor pursuant to the Stolen Valor Act

was a content-based restriction on free speech. The difference here is that Defendants' statements

were not lies about themselves; they were false, intentional and defamatory statements about others

which were intended to hurt Plaintiffs' reputations or businesses. No reasonable person would

---

[6] Indeed, the Court cannot to find any religious support for bearing false witness against another.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF
- Page 30

think these statements were meant for any other purpose than to harm the reputations and to threaten the persons being attacked by such statements. Such statements are not protected speech under the First Amendment.

Listening to and watching the videos of the Defendants and the published written statements of the Defendants Bundy and Rodriguez that claim their belief that "they" had the individual "right" to take the Infant (who is not even their child) back by violence if necessary is a profound misstatement and misunderstanding of the rule of law. In reality, it is a cry for "vigilante justice" which is the act of enforcing the law without legal authority to do so. Vigilante justice does not involve due process and allows one person to be the lawmaker, the law enforcer, the judge and jury without any investigation into the truth. Vigilante justice is not a "right" an individual or group of individuals have in this country.

Laws are passed by duly elected persons through a legislative process involving two representational governmental bodies and then also approved by the executive officer (the President of the United States or the Governor of a state). Laws are enforced by law enforcement officers in the executive branch of government. Challenges to the laws as being facially unconstitutional or unconstitutional as applied are for the judicial branch to decide.

Vigilante justice is not tolerated under the Constitution because it violates the rights of the accused. Vigilante justice expounded by the Defendants is meant to control others not by the rule of law, but by intimidation through threats of violence and the public shaming of others. Defendants clearly believe they are above the law and can operate outside the boundaries of our laws if they disagree with how the laws are being applied. That is not how our government works. A party can appeal a court's ruling and seek appellate review of a decision. The manner in which

to challenge any court's ruling is not through threat and intimidation. It is through the judicial process.

Moreover, if Defendants want the CPS statutes to be revised or changed, then they can lobby the legislature. While it is unclear exactly what changes to the law the Defendants seek, they are free to propose changes by working directly with legislators to sponsors bills. The Idaho Legislature has a long history of protecting children through the DHW, and nothing in this trial established the procedure approved by the Legislature was not followed or was misapplied based on the true health status of the Infant and the failure of the parents to allow the Infant to be seen for follow-up care. In fact, this case is an example of the CPS system working exactly as intended by the Legislature to protect the well-being of a child.

In several of the published statements by Defendants Bundy and Rodriguez they encouraged their followers to "follow the money" to prove how children are being harmed, trafficked, or kidnapped by CPS. No actual evidence was cited for this proposition by the Defendants and it was proven to be false at trial. Instead, the evidence in this case shows the only money being "made" by the events involving the Infant were St. Luke's and other medical practitioners receiving Medicaid reimbursement for the medical services provided (which was testified to be 70% of the actual cost of the care) and money flowing from donations by Defendants' followers (based on false defamatory statements about the Plaintiffs and others) to Defendants Bundy, Ammon Bundy for Governor, Rodriguez, People's Rights Network, Freedom Man Press LLC and Freedom Man PAC.

If Defendants wanted to present a defense of the "truth" of their statements, they could have participated in this lawsuit or at least the damages trial. They did not. The Court must take the undisputed facts presented at trial as true. Moreover, independent expert medical testimony as

well as common sense establishes the facts were not as Defendants maintained. The actual

numerous weights taken of the Infant as well as the results of other medical tests and the pictures

of the Infant did not present a healthy infant. Dr. Wheaton testified there was no misdiagnosis or

malpractice by the medical providers.

The Court finds St. Luke's did not initiate nor threaten to initiate CPS action. Did St. Luke's

become involved after the Infant was taken into the custody of DHW? Yes. However, no child was

"kidnapped" by the police or doctors. No child was "trafficked" or abused by DHW, the hospital,

the doctors or the courts. Instead, St. Luke's through its staff and medical providers provided the

*necessary* medical care the Infant needed (twice) and took care to receive the parents' consent for

the care provided even though during the second hospitalization was when the Infant was in the

temporary care and custody of DHW. All of the Infant's medical care was covered by Medicaid

insurance.

Dr. Whelan testified the need for CPS to get involved was due to the parents' failure to

attend follow-up appointments. In making this last statement, the Court does not in any way believe

the parents intended to harm the Infant. But the parents did neglect the medically needed follow-

up appointments to make sure the Infant was gaining, not losing, weight. New parents have a plan

for how they want to care for their child and they are allowed great freedom in implementing their

plan, until and unless the child's welfare is at risk. At that point, the DHW has a duty to step in, to

get the child the care it needs and then to develop a reunification plan so the child can return to its

home and thrive.

### 3. Permanent injunctive relief is appropriate in this case.

Permanent injunctive relief requiring the Defendants to stop making defamatory statements about the Plaintiffs, to remove defamatory and harassing statements or posts from online locations under the Defendants' control and prohibiting the Defendants from republishing the statements or posts is appropriate in this case. The statements, internet posts, online interviews made as part of a sustained campaign of defamation by Defendants and they continue to threaten or cause actual irreparable harm to the Plaintiffs. Based on the testimony of Mr. Roth, Dr. Erickson, NP Jungman, this conduct not only affects the individual Plaintiffs, but it also affects their families, their co-workers, their work environments. It also continues to negatively impact the reputation of St. Luke's in the community. The Court has no expectation that the defamatory statements will stop by Defendants without a permanent injunction.

This type of conduct can be enjoined by a court. While the Court could not find any on-point Idaho authority for the factual circumstances presented in this case, the Court can look to other jurisdictions for persuasive authority for internet smear campaigns. *See, e.g., Balboa Island Vill. Inn, Inc. v. Lemen*, 40 Cal. 4th 1141, 1155-57 (2007) (holding that the court may issue an injunction prohibiting the defendant from repeating statements judicially determined to be defamatory and rejecting argument that damages are the only remedy for defamation because otherwise the plaintiff would be required to bring a succession of lawsuits for damages which could be insufficient to deter the continuing tortious behavior); *Advanced Training Sys. v. Caswell Equip. Co.*, 352 N.W. 2d 1, 11 (Minn. 1984) (affirming permanent injunctive relief prohibiting republication of material found libelous at trial); *Weitsman v. Levesque*, Case No. 19-CV-461 JLS (AHG), 2020 WL 6825687, (S.D. Cal. Nov. 20, 2020) (applying New York law and collecting New York cases that removal orders are

necessary when parties refuse to depublish); *see also St. James Healthcare v. Cole*, 178 P.3d 696, (Mont. 2008) (affirming in part preliminary injunction against harassing and threatening statements).[7]

In *Weitsman*, the court ordered permanent injunctive relief when the defendant engaged in a "sustained Internet defamation campaign" falsely accusing the plaintiff of child trafficking. *Weitsman*, 2020 WL 6825687. The court entered default against the defendant, and the plaintiff obtained an award of compensatory and punitive damages. *Id.* The defendant had continued making the defamatory statements online, despite the litigation and an arrest warrant. *Id.* A permanent injunction was appropriate due to the intentional, sustained campaign of defamation aimed to injure the plaintiff's interests, including business interests. *See id.* The injunction was tailored to (1) require the removal of statements held to be defamatory whose postings online were under the defendant's control; and (2) prohibit the republication of statements held to be defamatory. *See id.*

The Defendants' actions attacking Plaintiffs in this case were relentless for over a year and with the specific intent to harm the reputations of St. Luke's and the other named Plaintiffs who did their job to ensure the Infant received necessary medical care. The Defendants continue to the present time in making defamatory statements to others about the Plaintiffs. There is every indication based on the Defendants' conduct over the prior year that the Defendants will continue to repeat and re-post the defamatory statements if no injunction is entered. The Court recognizes the Defendants have the means to influence thousands of followers, as they quickly organized protestors at the hospitals and across the country to disrupt St. Luke's business. This ability to mobilize others and to condone violence makes the threatened irreparable harm even more likely.

As several experts testified at trial, that once on the internet, it is difficult to remove defamatory statements from the internet, a simple retraction is inadequate relief for the Plaintiffs. Plaintiffs are entitled by law to have all the Defendants do everything in their power and on all

sites under their control (directly or indirectly) to remove all the judicially determined defamatory statements about the Plaintiffs. Moreover, the Defendants are ordered to stop making new or repeating previously made statements or postings with defamatory statements about the Plaintiffs. Further defamatory statements or invasion of Plaintiffs' privacy regarding the events with the Infant by Defendants could lead to new litigation for defamation.  This defamation against the Plaintiffs is not protected by the First Amendment and it must end.

If the defamatory statements are not taken down, they will be repeated and cause more irreparable threatened or actual harm to the Plaintiffs. The Plaintiffs have a right under law to seek injunctive relief from the Court to force the Defendants to stop making and publishing defamatory statements about the Plaintiffs. Plaintiffs followed the rule of law and legal process for having such a remedy ordered by the Court. The Plaintiffs proved the statements were intentional, false and made by Defendants with the specific intent to cause reputational damage to the Plaintiffs and to invade the Plaintiffs' privacy. The Defendants continue to try to raise monies based on the defamatory statements.

### 4.  Scope of injunctive relief.

The Court, in exercising its discretion, finds a permanent injunction is warranted under the law against the Defendants in this case. The Court exercises its discretion based on the findings of fact and conclusions of law to grant the equitable relief requested. "A permanent injunction requires a showing of threatened or actual irreparable injury." *Hood v. Poorman*, 171 Idaho 176, 519 P.3d 769, 783 (2022) (*citing O'Boskey v. First Fed. Sav. & Loan Ass'n of Boise*, 112 Idaho 1002, 1007, 739 P.2d 301, 306 (1987)). There is a threatened or actual irreparable injury to Plaintiffs if defamatory statements about the care of the Infant and the Plaintiffs are not stopped. The Defendants are aware their statements have been found by a jury and court of law to be

defamatory, so continuing to say the statements are true may expose Defendants to additional legal liability.

Defendants will be ordered to take the following actions to remove all defamatory statements and violations of the privacy of the Plaintiffs. Defendants must:

1. Cease posting and disseminating defamatory statements against all Plaintiffs.

2. Cease making statements that any of the Plaintiffs are criminals and/or are participating in unlawful kidnapping, trafficking, sexual or any other abuse, and/or killing of children.

3. Remove from all online locations or websites Defendants have authority to do so any and all statements that the Plaintiffs are criminals and/or participating in the kidnapping, trafficking, sexual or any other abuse, and/or killing of children.

4. Cease disseminating and encouraging others to disseminate the contact information, personal information, and images of Mr. Roth, Dr. Erickson, and NP Jungman.

5. Remove from all online locations and websites Defendants have authority to do so the contact information, personal information, and/or images of Mr. Roth, Dr. Erickson, and NP Jungman.

6. Deactivate links on other websites where Defendants or their agents posted links to defamatory statements or statements that invade the privacy of the Plaintiffs by portraying them in a false light.

Failure by the Defendants to follow the Order for Permanent Injunctive Relief may lead to contempt proceedings, sanctions and other legal ramifications.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF - Page 37

**Conclusion**

Fortunately for the Infant and our community, the Plaintiffs ignored the actions of the disrupters led by Bundy and Rodriguez and instead made saving the life of the Infant their priority. Plaintiffs St. Luke's and Mr. Roth were not distracted from their mission of providing medical care when needed to any member of our community regardless of a person's ability to pay. St. Luke's followed established medical treatment procedures and DHW followed Court orders, not the demands of the Defendants. Dr. Erickson and NP Jungman followed their oaths to help and not harm their patient. But the disinformation continues by Defendants even after the Infant was returned to its parents by the court through the CPS proceedings, even after the civil lawsuit was filed, and even after the jury verdict was returned.

Defendants' continued disinformation regarding the Plaintiffs does not help our community. The actions and conduct of the Defendants have made our community less safe. Medical providers and other employees are leaving their professions because of the damage to their reputations, the invasion of their privacy, the harassment and threats of intimidation by Defendants. Defendants' conduct and the conduct of their followers selfishly prevented third parties from coming to the St. Luke's hospitals and clinics for care, prevented the family members of other patients from seeing their loved ones at the hospital, disrupted the care of other patients, and threatened the safety of employees due to the sheer noise and intimidation of armed protestors surrounding the Boise hospital. The First Amendment protects and allows citizens to protest, but the First Amendment does not allow armed citizens to attempt to enter the private property of St. Luke's when it was locked down.

The defamatory statements of Defendants against the Plaintiffs have the indirect effect of making it more difficult to attract medical professionals to Idaho. The defamatory statements have

the direct effect of causing highly qualified medical professionals to leave the profession they love

due the stress from the intimidation and threats of personal harm by Defendants and their followers.

The defamatory statements have the direct effect of making it more difficult for other community

members to safely access medical care when needed.

A permanent injunction is warranted and appropriate in this case to stop Defendants from

reposting and repeating statements that have been deemed by a jury and the Court to be defamatory

and harmful to the reputational interests, privacy interests and emotional health of the Plaintiffs.

A retraction by Defendants is insufficient to reverse the continued threat of irreparable harm to the

Plaintiffs. Monetary damages, even if they can be collected, are inadequate to protect against

further harm to the Plaintiffs or to deter Defendants. In order to avoid the threatened or actual

irreparable harm to Plaintiffs reputations, professions, emotional health, the defamatory statements

of the Defendants must to be removed from the online sources controlled by Defendants (directly

or indirectly) and no longer repeated orally by Defendants.

**Order**

Based on the Findings of Fact and Conclusions of Law, the injunctive relief requested by

the Plaintiffs is appropriate and shall be ordered by the Court in a separate Permanent Injunction

Order. Plaintiffs shall submit a proposed Permanent Injunction Order for the Court's review

consistent with these Findings of Fact and Conclusions of Law. Plaintiffs are also directed to

provide a proposed Default Judgment to be entered consistent with this Order, the jury verdict and

previous attorney fees as sanctions ordered by the Court.

IT IS SO ORDERED.

Dated: ___8/25/23___

_____
NANCY A. BASKIN
District Judge

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF
- Page 39

## CERTIFICATE OF SERVICE

I, the undersigned, certify that on _____8/25/23_____, I caused a true and correct copy of the foregoing <u>FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF</u> to be forwarded with all required charges prepaid, by the method(s) indicated below, in accordance with the Rules of Civil Procedure, to the following person(s):

Erik F. Stidham                                                         (X) Email
Jennifer M. Jensen
Zachery J. McCraney
Alexandra S. Grande
efstidham@hollandhart.com
jmjensen@hollandhart.com
zjmccraney@hollandhart.com
aehenderson@hollandhart.com
*Attorney for Plaintiff(s)*

Diego Rodriguez                                                     (X) Email
freedommanpress@protonmail.com
*Pro Se Defendant*

Ammon Bundy, Ammon Bundy for Governor,          (X) Mail
and People's Rights Network
c/o Ammon Bundy
4615 Harvest Lane
Emmett ID 83617-3601
*Pro Se Defendant*

Ammon Bundy for Governor                                   (X) Mail
And People's Rights Network
c/o Ammon Bundy
P.O. Box 370
Emmett ID 83617
*Pro Se Defendant*

Freedom Man Press LLC and Freedom Man PAC     (X) Mail
c/o Diego Rodriguez
1317 Edgewater DR #5077
Orlando, FL 32804
*Pro Se Defendant*

TRENT TRIPPLE
Clerk of the District Court

By _____
Deputy Clerk

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR INJUNCTIVE RELIEF - Page 40