Ammon E. Bundy
P.O. Box 1062
Cedar City, Utah 84720
208-872-4030

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

FILED US Bankruptcy Court-UT
JUN 20 2025 PM 1:26

| Ref: | Case No.: 24-23530 |
|---|---|
| **AMMON EDWARD BUNDY** | **Chapter 7** |
| | **William T. Thurman** |

## OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### SUMMARY OF ARGUMENT

Plaintiffs seek to transform a default judgment—obtained without trial on the issues of intent or malice—into a conclusive basis for denying discharge under 11 U.S.C. § 523(a)(6). That effort fails both legally and factually.

Issue preclusion does not apply to default judgments where the factual matters were never litigated, as recognized by controlling precedent in this Circuit. More importantly, Plaintiffs' entire theory rests on the false premise that Mr. Bundy acted maliciously and with the intent to harm. The record shows otherwise.

Mr. Bundy's speech and conduct arose from a public dispute over the treatment of a child, and his actions were rooted in sincere concern and constitutionally protected advocacy. Plaintiffs' case hinges on distorted trial narratives, including altered video evidence and misleading testimony contradicted by medical records and bodycam footage. The trial itself was tainted by misinformation, inflammatory labels, and concealed facts—none of which support a finding of willful and malicious injury.

Furthermore, this adversary proceeding must be understood in context: Plaintiffs filed their suit in the midst of Mr. Bundy's campaign for Governor of Idaho. They sued not



only him personally, but also "Ammon Bundy for Governor." Their goal was to suppress dissent and inflict maximum reputational harm—not to redress any cognizable injury.

The Bankruptcy Code does not exist to silence political critics. It does not empower courts to enforce multimillion-dollar judgments arising from flawed civil trials, especially when the underlying conduct is speech protected by the First Amendment.

Summary judgment should be denied.

## I. INTRODUCTION

Comes now Defendant Ammon Edward Bundy and respectfully opposes Plaintiffs' Motion for Summary Judgment. Plaintiffs seek to except their claim from discharge under 11 U.S.C. § 523(a)(6) based on a default judgment in Idaho state court. However, that judgment resulted from Mr. Bundy's non-participation in the proceedings, and the elements of § 523(a)(6)—particularly intent and malice—were never actually litigated.

Moreover, Mr. Bundy acted at all times based on sincere concern for the welfare of Baby Cyrus and his family, not to harm the Plaintiffs. His speech was protected by the First Amendment and rooted in political advocacy. Summary judgment is inappropriate.

## II. ISSUE PRECLUSION DOES NOT APPLY TO THE IDAHO DEFAULT JUDGMENT

Plaintiffs seek to rely on findings that were not actually litigated, but instead adopted after default in an uncontested state proceeding. This reliance is improper and fundamentally unfair.

Although the Idaho state court signed a document styled "Findings of Fact and Conclusions of Law" prepared by Plaintiffs' counsel, those findings were entered **after liability had already been determined by default judgment**. Mr. Bundy was not present, was unrepresented, and was given no opportunity to challenge the proposed

findings or offer contrary evidence. As such, the so-called findings were not tested in an adversarial proceeding, nor were they the result of any evidentiary hearing. They represent **nothing more than a unilateral recitation of Plaintiffs' allegations**, rubber-stamped by the court after default.

The law in the Tenth Circuit is clear: **Issue preclusion does not apply to issues that were not actually litigated and determined in a full and fair adversarial process**. The Bankruptcy Appellate Panel in *In re Gagle*, 230 B.R. 174, 178 (10th Cir. B.A.P. 1999), held that "[a] default judgment, even if accompanied by findings, is not given issue preclusive effect" unless the party had a full opportunity to participate. Similarly, in *In re Jordana*, 216 F.3d 1087 (10th Cir. 2000) (table), the Tenth Circuit declined to apply issue preclusion to post-default findings, emphasizing that the labels "findings of fact" or "conclusions of law" do not transform unlitigated assertions into preclusive adjudications.

Federal courts have long guarded against the misuse of default judgments to preclude litigation of essential elements in later proceedings. The Supreme Court has explained that the "actual litigation" requirement is a due process safeguard to prevent one-sided outcomes from being treated as binding in future cases. See *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 480–81 (1982).

In this case, Plaintiffs attempt to use a one-sided, unopposed judgment as conclusive proof of willfulness and malice—elements that require a detailed factual inquiry into the debtor's state of mind and intent. Such an approach not only offends basic fairness, but it also contradicts binding precedent.

Because the Idaho judgment was entered by default, and because no evidentiary hearing occurred on Mr. Bundy's intent, **there was no actual litigation of the elements required under 11 U.S.C. § 523(a)(6)**. The findings signed by the court merely reflect Plaintiffs' narrative, untested and unrebutted.

To accept issue preclusion here would be to **weaponize a default judgment**, granting it greater force than a contested one. That outcome is both legally unsound and constitutionally impermissible. Due process demands more.

This Court should therefore decline to give any preclusive effect to the Idaho default judgment or the findings that followed it.

## III. MR. BUNDY DID NOT ACT WILLFULLY OR MALICIOUSLY

*Additional Evidence of Misconduct by Plaintiffs' Counsel*

*False Testimony by Dr. Rachael Thomas Contradicted by Her Own Records*

At trial, St. Luke's presented testimony from Dr. Rachel Thomas, who told the jury that Baby Cyrus was in grave medical danger, could not sit up, and might have died without intervention. This testimony was intended to justify the emergency actions taken by St. Luke's and to vilify Mr. Bundy's public criticism.

However, this testimony was false, and is directly contradicted by:

- **Ambulance records**, in which the EMT recorded that Dr. Thomas said: "<u>Just go, this is a healthy baby with no interventions.</u>"
- **Bodycam footage**, where Dr. Thomas is recorded saying the baby is "totally stable," and also states, "We are going to break some protocol and take an ambulance to a different entrance because this is a medically stable patient."
- **Medical records**, which note that Cyrus was "cleared for discharge" and stable, and that the only reason for his transfer was due to "social difficulties" and the presence of protesters outside;
- **Ambulance and EMT records**, which describe Cyrus as "alert," "appropriately interactive," and not in acute distress;
- **Video evidence showing Cyrus sitting up on his own**, directly refuting Dr. Thomas's testimony that he was incapable of doing so;
- **CPS, medical records, and police bodycam footage**, all show that a foster parent was already present at the Meridian hospital to take Baby Cyrus home that night. Dr. Thomas, the Meridian police officers, and CPS agents had coordinated

to discharge Cyrus into the care of the "foster mom" that night. However, due to the presence of peaceful protesters outside the hospital, they changed the plan and transferred the child to St. Luke's Boise campus to evade public attention, with the intention of placing him with the foster parent the following day "without them knowing".

This pattern of misrepresentation reflects not just witness error, but **coordinated trial misconduct** intended to inflame the jury and distort the factual basis of the case.

Further undermining the claim of willful and malicious conduct, Plaintiffs' counsel presented an **altered and misleading video** to the Idaho jury. The video was an edited version of a public address by Mr. Bundy concerning Baby Cyrus. Plaintiffs' version spliced together segments and **omitted key statements** in which Mr. Bundy explicitly urged his supporters to remain peaceful, lawful, and not to engage in any acts of intimidation or violence.

The edit reversed the meaning of Mr. Bundy's message and portrayed him as inciting "patriot groups" when, in fact, he had stated the opposite. Mr. Bundy was not present at trial to correct this false narrative, and the deliberate manipulation of this evidence significantly prejudiced the outcome.

This misconduct was part of a broader pattern. Plaintiffs' attorney, Erik Stidham, and St. Luke's CEO, Chris Roth, orchestrated a trial strategy based on **knowingly false narratives and racially charged misinformation**. The jury was misled into believing Mr. Bundy was a "white nationalist"—a baseless and inflammatory claim, particularly given his personal friendship with Baby Cyrus's grandfather, Diego Rodriguez, who is Hispanic, and baby Cyrus being a mixed-race child.

Moreover, Plaintiffs alleged Mr. Bundy was involved in a "firefight with law enforcement"—a fabrication wholly unsupported by the facts. Mr. Bundy and others were ambushed in Oregon in 2016 en-route to a peaceful community meeting. No one in Mr. Bundy's group fired a shot; all were acquitted. Yet Plaintiffs' counsel weaponized this incident to vilify Mr. Bundy and paint him as dangerous.

The court was also misled regarding the medical circumstances surrounding Baby Cyrus's hospitalization. Plaintiffs repeatedly claimed that Cyrus would have died without intervention—contradicted by internal medical records, ambulance notes, and video-recorded statements from hospital personnel. St. Luke's staff admitted that Cyrus was stable and medically cleared, and that the transfer to Boise occurred **not for medical reasons**, but to avoid protesters. Statements by Dr. Rachel Thomas and Dr. Natasha Erickson corroborate this.

All of this misconduct—altered video, false allegations, inflammatory racial and criminal accusations, and concealment of exculpatory medical facts—demonstrates a **coordinated effort to deceive the jury** and secure an unjust and punitive judgment. This campaign of distortion undermines the integrity of the state court judgment and provides further reason to reject Plaintiffs' § 523(a)(6) claim in this adversary proceeding.

## IV. MR. BUNDY'S SPEECH WAS CONSTITUTIONALLY PROTECTED AND CANNOT SUPPORT NONDISCHARGEABILITY

This argument is particularly strong in the Tenth Circuit. In *In re Hensley*, 469 B.R. 51 (Bankr. D. Kan. 2012), the court held that critical, controversial, or even offensive speech cannot serve as a basis for nondischargeability under § 523(a)(6) unless it was intended to cause a specific injury. Similarly, in *In re Perry*, 423 B.R. 215, 270–71 (Bankr. S.D. Tex. 2010), the court declined to find malicious conduct where the debtor's expression involved a campaign of criticism, noting the importance of protecting vigorous public discourse.

Here, Mr. Bundy's speech clearly fits within the constitutional protections afforded to political advocacy. He was responding to what he perceived as state overreach and medical coercion. The fact that he named or criticized St. Luke's or its staff in that context does not strip his speech of protection. The Bankruptcy Code cannot be used as a tool to punish lawful dissent.

Moreover, the discharge exception under § 523(a)(6) should not be interpreted to permit litigants to relitigate or penalize speech that would otherwise be constitutionally protected. Doing so would not only chill public expression but would open the door to weaponized litigation against dissidents and reformers.

Courts have repeatedly emphasized that political expression, even when emotionally charged or harshly critical, does not rise to the level of willful and malicious injury. In *In re Trammell*, 2015 WL 3795887 (Bankr. W.D. Okla. June 17, 2015), the court held that derogatory statements about public figures, absent a showing of specific intent to harm, did not satisfy § 523(a)(6). Similarly, in *In re Whiters*, 337 B.R. 326 (Bankr. N.D. Ind. 2006), a debtor's public criticisms of a hospital and its staff were held insufficient to demonstrate malice, as the statements were made in connection with a political grievance involving a child custody matter.

These cases align with the principle that bankruptcy courts must tread cautiously when adjudicating claims tied to expressive conduct, lest they encroach on constitutionally protected rights. Here, Plaintiffs' effort to convert Mr. Bundy's political activism into nondischargeable debt fundamentally misunderstands both the nature of his speech and the limitations of § 523(a)(6). Doing so would not only chill public expression but would open the door to weaponized litigation against dissidents and reformers.

## V. PLAINTIFFS USED LITIGATION TO SILENCE A POLITICAL CRITIC

Plaintiffs' conduct must be understood not only through the lens of legal pleading, but also as a strategic maneuver to inflict reputational harm and suppress political dissent. Their timing and tactics reveal a concerted effort to silence a high-profile critic during a gubernatorial campaign.

St. Luke's filed its lawsuit against Mr. Bundy and others **barely one month after Baby Cyrus was returned** to his family. By that point, Mr. Bundy had publicly expressed relief and gratitude that the child was back with his parents and had largely moved on

from the incident. Yet Plaintiffs chose to escalate—not for redress, but for retribution. Their original complaint sought **only $50,000 in damages**, but the final judgment ballooned to **over $50 million**—a staggering and disproportionate sum rendered via default.

Even more telling, Plaintiffs did not merely sue Mr. Bundy in his personal capacity—they also named **"Ammon Bundy for Governor"** as a defendant. This was not a clerical overlap or coincidence; it was a clear attempt to **derail Mr. Bundy's political campaign** and inflict maximum damage at the most vulnerable moment. Mr. Bundy was forced to redirect time, energy, and financial resources away from his campaign and toward defending himself from baseless and politically charged litigation. Despite this, he went on to receive **more votes than any independent candidate in Idaho history**.

What followed was an escalating campaign of procedural abuse. Once Plaintiffs' counsel realized that Mr. Bundy was not actively participating in the litigation, they filed for and obtained a **protective order** aimed not merely at shielding personnel, but at **gagging Mr. Bundy's public speech** on the matter. The court granted this order based on Plaintiffs' framing. When Mr. Bundy continued to speak publicly—while on the campaign trail—Plaintiffs filed **contempt motions**, leading to the issuance of **an arrest warrant**.

This caused Mr. Bundy to reasonably fear attending court proceedings, as doing so could result in immediate incarceration. The pattern repeated itself, with Plaintiffs using court powers to enforce silence through the threat of jail, creating an untenable choice: exercise free speech and risk arrest, or forfeit public advocacy altogether.

These maneuvers had their intended effect—Mr. Bundy's campaign was impaired, his public participation chilled, and his legal defenses stifled. Yet these facts also expose the broader purpose of the lawsuit: **to weaponize judicial processes as tools of suppression**, not justice.

Courts have recognized that when litigation is used to silence critics or chill public expression, it raises serious constitutional concerns. See *BE&K Constr. Co. v. NLRB*, 536

U.S. 516, 531 (2002) (recognizing that even unsuccessful lawsuits can violate the First Amendment if intended to burden protected expression).

This context matters. It demonstrates that Plaintiffs' motivations were not rooted in a good-faith effort to address harm, but rather to **discredit, punish, and silence** a political opponent. That is not a permissible use of the legal system, and it provides further grounds to deny summary judgment in this case.

By transforming a public controversy into a punitive civil judgment—then using that judgment as a cudgel in bankruptcy court—Plaintiffs seek not justice, but **permanent silencing**. Their narrative of victimization cannot be accepted without scrutiny of these underlying motives and tactics. Litigation should not be a tool for powerful institutions to eliminate critics, especially when those critics are engaged in **constitutionally protected political speech**.

## VI. STATEMENT OF DISPUTED MATERIAL FACTS

1. The Idaho judgment was entered by default. Although the court later signed Findings of Fact and Conclusions of Law drafted by Plaintiffs, those findings were entered after default, were not subject to adversarial testing, and do not constitute factual findings made through actual litigation or evidentiary hearing on intent.
2. Mr. Bundy had no prior conflict with St. Luke's.
3. Mr. Bundy did not direct or encourage violence.
4. Mr. Bundy was motivated solely by concern for Baby Cyrus.
5. Mr. Bundy was running for Governor when the lawsuit was filed.
6. Plaintiffs sued both Mr. Bundy and his campaign.
7. Plaintiffs initially sought only $50,000.
8. Mr. Bundy criticized specific conduct, not the institution as a whole.
9. Plaintiffs misrepresented his words and motives in the media.
10. Mr. Bundy's speech was protected political expression.

## VII. EXHIBIT LIST

- Exhibit A: Declaration of Ammon Edward Bundy
- Exhibit B: Original (Unedited) Video of April 2022 Public Statement
- Exhibit C: Edited Video Version Presented at Trial
- Exhibit D: Transcript Comparison (Original vs. Edited Video)
- Exhibit E: Dr. Rachel Thomas Bodycam Quote – Transfer "Not Medically Necessary"; plan to send baby home with foster parent – transfer made to evade protesters
- Exhibit F: Police Bodycam Footage – Dr. Rachel Thomas stating the baby is "totally stable" and noting plan to use alternate entrance
- Exhibit G: Ambulance and EMT Records – Cyrus described as "alert," "appropriately interactive," and "not in acute distress"; quoting Dr. Thomas: "Just go, this is a healthy baby with no interventions"
- Exhibit H: Trial Audio Transcript – Dr. Rachael Thomas describing baby Cyrus "Like a Hatti baby – could not sit up on his own"
- Exhibit I: Medical Records Showing Baby Cyrus Sitting Up Unassisted
- Exhibit J: Trial Audio Transcript – Dr. Rachael Thomas describing baby Cyrus as the worst she had ever treated
- Exhibit K: Police Body Camera Footage – Baby Cyrus in his mother's arms right before they took him
- Exhibit L: Medical Records – Pictures of Baby Cyrus in the Hospital
- Exhibit M: Dr. Natasha Erickson Medical Notes – Transfer Due to Protesters – Social Concerns
- Exhibit N: Medical Records – Showing Foster Parent Presence and Initial Discharge Plan
- Exhibit O: Plaintiffs' Initial Complaint Seeking $50,000 in Damages
- Exhibit P: Campaign Records Showing Lawsuit Filed Against "Ammon Bundy for Governor"
- Exhibit Q: Court Document – Default Judgment

## VIII. CONCLUSION

This case is not about a willful and malicious injury. It is about a hospital system using the courts to punish political criticism. The judgment was obtained by default, without litigating the key issues. Plaintiffs seek to leverage that judgment to silence Mr. Bundy permanently.

This Court should not allow it. Summary judgment must be denied so that the full facts can be heard.

DATED: June 12, 2025

Respectfully submitted,

Ammon Edward Bundy
P.O. Box 1062
Cedar City, UT 84721
Email: aebundy@bundyfarms.com
Phone: (208) 872-3040
I certify that on this day I served a copy of the attached to:

UNITED STATES BANKRUPTCY COURT, DISTRICT OF UTAH

| | | | |
|---|---|---|---|
| | 350 S Main St, Salt Lake City, UT 84101 | [X] | USPS |
| Mark C. Rose, Trustee | mrose@mbt-law.com | [X] | Email |
| Erik Stidham | efstidham@hollandhart.com | [X] | Email |

**DATED THIS DAY,** the 12th of June, 2025.

Ammon Bundy

## Exhibit A: Declaration of Ammon Edward Bundy

Ammon E. Bundy
P.O. Box 1062
Cedar City, Utah 84720
208-872-4030

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF UTAH**

**In re:**

**AMMON EDWARD BUNDY,**                                           Case No.: 24-23530
                                                                                               Chapter 7
                                                                                               William T. Thurman

**DECLARATION OF AMMON EDWARD BUNDY**

I, Ammon Edward Bundy, declare under penalty of perjury pursuant to the laws of the
United States and the State of Utah that the following is true and correct to the best of my
knowledge:

1. I am the Defendant in this adversary proceeding and the Debtor in the underlying
bankruptcy case. I make this declaration in support of my opposition to Plaintiffs' Motion
for Summary Judgment.

2. In 2022, I became involved in speaking out publicly after the Idaho Department of
Health and Welfare, with support from law enforcement and St. Luke's Health System,
removed Baby Cyrus from his family. My concern was based on what I believed to be an
abuse of state power, and my actions were motivated solely by concern for the child and
his family.

3. My speech and actions were peaceful. I never encouraged, directed, or intended
violence against St. Luke's, its staff, or anyone else. I publicly called for lawful conduct
and made it clear that my objective was transparency and accountability.

4. At the time Plaintiffs filed their lawsuit, I was running as an independent candidate for
Governor of Idaho. Plaintiffs sued not only me personally but also 'Ammon Bundy for

Governor.' This had a chilling effect on my campaign and diverted my time, energy, and resources from the election effort to defending myself from this legal action.

5. Plaintiffs filed their lawsuit just weeks after Baby Cyrus was returned to his family. At that point, I had already expressed gratitude that the matter was resolved and had largely moved on. I had no ongoing dispute with St. Luke's until they initiated litigation.

6. After I did not appear in the civil suit, Plaintiffs obtained a default judgment and submitted proposed findings of fact and conclusions of law. These were adopted by the court without any evidentiary hearing or opportunity for me to contest them. No actual litigation occurred regarding my state of mind, intent, or malice.

7. Plaintiffs subsequently used the default judgment to obtain a protective order intended to restrict my public speech. When I continued to speak publicly, Plaintiffs sought and obtained contempt findings and an arrest warrant. I reasonably feared that attending any court proceedings would result in my immediate incarceration.

8. This threat to my liberty made it virtually impossible to defend myself. I was under constant fear of arrest, particularly while I was engaged in public appearances on the campaign trail. This pattern of legal intimidation chilled my speech and further undermined my ability to participate in the litigation.

9. I later discovered that Plaintiffs' legal team presented altered video evidence during the trial. The edited video removed my explicit disclaimers against violence and falsely portrayed me as inciting unlawful conduct. The version used in court was spliced to remove key statements and presented a misleading narrative.

10. I also reviewed testimony from Dr. Rachel Thomas, who claimed that Baby Cyrus was in medical crisis and could not sit up. However, ambulance records and bodycam footage show that she described the child as 'totally stable' and told EMTs, 'Just go, this is a healthy baby with no interventions.' Video shows the child sitting up unassisted, contradicting her testimony.

11. Records from CPS, police, and St. Luke's staff confirm that a foster parent was already present to take Baby Cyrus home from the Meridian hospital. Due to peaceful

protesters outside, the plan was changed to transfer him to Boise to avoid media attention—not for any medical reason.

12. Plaintiffs' campaign to obtain a massive civil judgment—escalating from an initial $50,000 demand to over $50 million—was never about compensating for harm. It was a calculated effort to silence and punish me, a political critic, and to derail my campaign.

13. I affirm that every statement I made during that time was rooted in sincere concern for the child's welfare and in constitutionally protected political speech.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


DATED: June 12, 2025
Respectfully submitted,


Ammon Edward Bundy
Pro Se Defendant
P.O. Box 1062
Cedar City, UT 84721
Email: aebundy@bundyfarms.com
Phone: (208) 872-3040

I certify that on this day I served a copy of the attached to:


UNITED STATES BANKRUPTCY COURT, DISTRICT OF UTAH

|  | 350 S Main St, Salt Lake City, UT 84101 | [X] | USPS |
|---|---|---|---|
| Mark C. Rose, Trustee | mrose@mbt-law.com | [X] | Email |
| Erik Stidham | efstidham@hollandhart.com | [X] | Email |


**DATED THIS DAY**, the 12th of June, 2025.

Ammon Bundy

**Exhibit B: Original (Unedited) Video of April 2022 Public Statement**



Exhibit provided on a USB drive labeled:

"Exhibit - Video Files Supporting Opposition to Summary Judgment"

**Exhibit C: Edited Video Version Presented at Trial**



Exhibit provided on a USB drive labeled:

"Exhibit - Video Files Supporting Opposition to Summary Judgment"

**Exhibit D: Transcript Comparison (Original vs Edited Video)**

-------------------------------------

Original (Unedited) Statement:

-------------------------------------

*"I have to say that I'm not okay with any of this. To be honest with you, if justice was to be served, we would go into the hospital, take that baby, and we'd give it back to their mother. And then if we were further to administrate justice, we would find those that are accountable and we would uh prosecute them, and uh, and uh, you know, make them uh, pay, for the damages that they caused to this family and assure that this never happens again.*

*That's what should happen. And uh, I will say this, that I'm not alone in those feelings, but uh we also have had to suppress those uh those thoughts and actions uh because we are trying to give the people that are uh, making the decisions that are doing this thing to them—give them a chance to correct this issue so that we don't have to do it for them."*

-------------------------------------

Edited Version Shown to Jury:

-------------------------------------

*"...if justice was to be served, we would go into the hospital, take that baby, and we'd give it back to their mother. And then if we were further to administrate justice, we would find those that are accountable and we would uh prosecute them, and uh, and uh, you know, make them uh, pay, <u>I know that there are groups, uh patriot groups, that have wanted to come. And uh, and just do what needs to be done</u>..."*

**Exhibit E: Dr. Rachel Thomas Bodycam Quote – Transfer "Not Medically Necessary"- Plan to send baby home with foster parent – Transfer made to evade protesters.**



Exhibit provided on a USB drive labeled:

"Exhibit – Video Files Supporting Opposition to Summary Judgment"

**Exhibit F: Police Bodycam Footage – Dr. Rachel Thomas stating the baby is "totally stable" and noting plan to use alternate entrance.**



Exhibit provided on a USB drive labeled:

"Exhibit – Video Files Supporting Opposition to Summary Judgment"

**Exhibit G: Ambulance and EMT Records – Cyrus described as "alert," "appropriately interactive," and "not in acute distress"; quoting Dr. Thomas: _"Just go, this is a healthy baby with no interventions"_**



Anderson, Cyrus James
MRN: 4269116  DOB: 5/1/2021  Sex: M
Records from: EMS Charts

Media (continued)

**Exhibit H: Trail Audio Transcript – Dr. Rachael Thomas describing baby Cyrus "Like a Hatti baby – could not sit up on his own".**



Exhibit provided on a USB drive labeled:

"Exhibit – Video Files Supporting Opposition to Summary Judgment"

## Exhibit I: Medical Records Showing Baby Cyrus Sitting Up Unassisted

 St Luke's

Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

---

**03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

Media (Encounter and Order) (group 1 of 2) (continued)

**Clinical Photos - Scan on 3/14/2022  2:27 PM**

Clinical date time: 3/14/2022 1427                                    User: Jamie E. Price, MD
Description: —

Scan (below)



---

**Exhibit J: Trail Audio Transcript – Dr. Rachael Thomas describing baby
Cyrus as the worst she had ever treated**



Exhibit provided on a USB drive labeled:

"Exhibit – Video Files Supporting Opposition to Summary Judgment"

**Exhibit K: Police Body Camera Footage - Baby Cyrus in his mother arms right before they took him.**



Exhibit provided on a USB drive labeled:

"Exhibit – Video Files Supporting Opposition to Summary Judgment"

**Exhibit L: Medical Records – Pictures of baby Cyrus in the hospital**

 **St Luke's**

Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

---

**03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

Media (Encounter and Order) (group 1 of 2)

**Clinical Photos - Scan on 3/12/2022 2:33 AM**

Clinical date/time: 3/12/2022 0233                    User: Natasha D. Erickson, MD
Description: —

Scan (below)



 **St Luke's**

Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

---

**03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

**All Encounter Notes (group 1 of 3) (continued)**

Primary caregiver at home: mother
Drug/Alcohol use: unknown
Day care: no
Maternal employment: no
Paternal employment: unknown

Social worker present for evaluation: No, discussed in detail with Brianne.

**Physical Examination:**
BP 99/56 (BP Location: Right leg, Patient Position: Lying) | Pulse 100 | Temp 36.9 °C (98.5 °F) (Axillary) | Resp 28 | Ht 71.5 cm (28.15") | Wt 6.28 kg (13 lb 13.5 oz) | HC 45 cm (17.72") | SpO2 99% | BMI 12.28 kg/m²

GENERAL: **Somnolent, falls asleep when left undisturbed, arouses without difficulty, cachectic, thin appearing**
HEENT: Ears: well-positioned, well-formed pinnae. pearly TM, Mouth: Normal tongue, palate intact, Neck: normal structure, Nose and sinus: Nose: small amount of dried, yellow secretions in right nare discharge
NECK: Normal, supple
LUNGS: Normal respiratory effort. Lungs clear to auscultation
HEART: Normal PMI, regular rate & rhythm, normal S1,S2, no murmurs, rubs, or gallops
ABDOMEN: Soft, Nontender, No organomegaly
MUSCULOSKELETAL: **Poor muscle bulk**
NEUROLOGIC: **Intermittently listless, poor tone, significant head lag**
GENITOURINARY: Normal Tanner 1 male genitalia, urine bag in place
SKIN: **Decreased skin turgor, ribs and spine visibly protruding, area of discoloration (slight hyperpigmentation) on right lateral/posterior lower ribcage**



---

 St Luke's

Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022. Adm: 3/12/2022, D/C: 3/15/2022

---

**03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

**All Encounter Notes (group 1 of 3) (continued)**





**Laboratory Studies:**
Recent Results (from the past 24 hour(s))
CBC
   Collection Time: 03/12/22  1:24 AM

| Result | Value | Ref Range |
|---|---|---|
| WBC COUNT | 9.32 | 5.50 - 18.00 10*3/uL |
| RBC COUNT | 4.34 | 3.50 - 5.50 10*6/uL |
| HEMOGLOBIN | 12.3 | 10.5 - 13.5 g/dL |

**Exhibit M: Dr. Natasha Erickson Medical Notes – Transfer Due to Protesters - Social Concerns**



Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

---

**03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

**All Encounter Notes (group 1 of 3) (continued)**

Baby is sleeping at this time, held by this CAP. awaiting transport to bmc peds

Bryson Davis, CNA
03/12/22 0149

Electronically signed by Bryson Davis, CNA at 3/12/2022 1:49 AM

---

**Progress Notes by Caitlin E. Stagg, LMSW at 3/12/2022 0246**

SW placed a copy of Notice of Emergency Removal in medical records and faxed a copy to Boise Pediatric unit where pt has been transferred. Shelter care hearing is set for Tuesday 03/15/22. CPS worker Mariam was also provided with a copy of Notice of Emergency Removal prior to transfer from Meridian ED.

Electronically signed by Caitlin E. Stagg, LMSW at 3/12/2022 2:50 AM

---

**H&P by Natasha D. Erickson, MD at 3/12/2022 0304**

**PEDIATRIC HOSPITALIST ADMISSION NOTE**

Natasha D. Erickson, MD

Active Problems:
  Malnutrition (HCC)
  Failure to thrive (child)

Weight loss

Cyrus is a 10 m.o. male discharged from the hospital on 3/4, who presents with weight loss in the setting of failure to thrive. Patient was admitted from 3/1-3/4 after being referred for admission due to severe malnutrition. Initially the patient required NG feeds, but at discharge, he was taking bottle feeds without issue. He was discharged home with an NG in place and family was provided syringe feeding supplies in case the patient's po intake dropped off. Family did not go home with a feeding pump as they declined this, citing cost (they are self-pay). He was scheduled to see his PCP on 3/6, but did not show for the appointment. Home health was also not able to get in touch with the family. Case was discussed on 3/11 with Tracy Jungman with CARES who reported the child had not been seen and despite multiple attempts to contact the family, the patient had not returned for a weight check. Ultimately, health and welfare and law enforcement became involved. It is my understanding a warrant was issued and the child was removed from the home and declared immediately. He was brought to the Meridian ED for evaluation. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the foster family from the ED was unsafe for all involved. For this reason, the patient was transferred to Boise for further care.

## Exhibit N: Medical Records - Showing Foster Parent Presence and Initial Discharge Plan

 **St Luke's**

Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

---

### 03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)

**All Encounter Notes (group 1 of 3) (continued)**

no frenulum injury, fontanelles are appropriate. Patient is tearful but consolable with being held. A bottle was offered to the child at this time the child immediately took a eating 6 ounces without difficulty. Weight was obtained and patient's weight is currently 6.31 kg, at discharge on the fourth patient was 6.545 kg. Blood work was obtained and patient is hypoglycemic which is consistent with poor feeding. Child has demonstrated that he is able and willing to feed while here in the department. At this time there are social difficulties in this situation, it was felt the patient was most appropriate for admission as there is concern about CPS attempting to leave the hospital with the child being followed to the ████care family's home. Furthermore child has significant findings of dehydration and malnutrition. I do not feel IV fluid resuscitation is necessary as child is able to take feeds without difficulty. Patient was transferred to St. Luke's Boise at this time for admission.

**FOLLOW-UP RECOMMENDATIONS:**
No follow-up provider specified.

Test results were discussed with the patient and/or the patient's family.

The diagnosis was discussed with the patient and/or the patient's family.

The treatment plan, as specified under disposition docuemtation, was discussed with the patient and/or the patient's family. The patient and/or the patient's family have expressed understanding and comprehension of the plan.

Final diagnoses:
[R62.51] Failure to thrive (child)
[E43] Severe malnutrition (HCC)
[E16.2] Hypoglycemia

Rachel M. Thomas, MD
03/12/22 0432

Rachel M. Thomas, MD
03/12/22 0630

Electronically signed by Rachel M. Thomas, MD at 3/12/2022, 6:30 AM

---

**Progress Notes by Shawn Feigel, RN at 3/12/2022 0700**

End of Day RN Shift Report

**Vital Signs & Assessment:** as charted

**Interventions:** none

**PRN Meds Given:** none

---

Generated on 3/24/22 10:33 AM

## Exhibit O: Plaintiffs' Initial Complaint Seeking $50,000 in Damages (Pg-32)

190.    In furtherance of this conspiracy, Defendants defamed all Plaintiffs, invaded the privacy of Mr. Roth and Dr. Erickson, intentionally inflicted emotional distress on Mr. Roth and Dr. Erickson, unlawfully trespassed onto Plaintiff St. Luke's property, committed unfair trade practices against all Plaintiffs, and defamed all Plaintiffs in furtherance of a conspiracy to violate the Idaho Charitable Solicitation Act.

191.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

192.    By virtue of the formation and operation of this conspiracy, Defendants, as participants in the conspiracy, are liable as joint tortfeasors for each other's misconduct.

### REQUEST FOR JURY TRIAL

Pursuant to Idaho Rule of Civil Procedure 38, Plaintiffs hereby request trial by jury as to all issues that are properly so tried.

### PRAYER FOR RELIEF

Counterclaimants respectfully request the following relief from this Court:

A.    An award to St. Luke's Parties for damages in the sum to be proven at trial but in no event less than $50,000;

B.    Injunctive relief requiring the Defendants to cease posting and disseminating defamatory statements against the St. Luke's Parties;

C.    An award to the St. Luke's Parties of their reasonable attorneys' fees and costs for this matter under Idaho Code §§ 12-120(3), 12-121, or other applicable authorities and statutes; and

D.    Provide such other relief as the Court determines fair, just, and appropriate under the circumstances.

DATED this 14th day of May, 2023.

HOLLAND & HART LLP

By: _s_ *Erik F. Stidham*_____
   Erik F. Stidham
   *Counsel for Plaintiffs*

ST. LUKE'S COMPLAINT AND DEMAND FOR JURY TRIAL - 33

**Exhibit P: Campaign Records Showing Lawsuit Filed Against 'Ammon Bundy for Governor (Pg-1)**

Erik F. Stidham (ISB #5483)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-5974
Telephone: 208-342-5000
Facsimile: 208-343-8869
E-mail: efstidham@hollandhart.com

*Counsel for Plaintiffs*



NO. _____
A.M. _____ FILED P.M.

MAY 11 2022

PHIL McGRANE, Clerk
By JAMIE MARTIN
DEPUTY

**IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE**

**STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA**

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD.; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.; CHRIS ROTH, an individual; and NATASHA D. ERICKSON, MD, an individual, | Case No. **CV 01 22 06789** |
| Plaintiffs, | **ST. LUKE'S COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | |
| AMMON BUNDY, an individual; AMMON BUNDY FOR GOVERNOR, a political organization; DIEGO RODRIGUEZ, an individual; FREEDOM MAN PRESS LLC, a limited liability company; FREEDOM MAN PAC, a registered political action committee; and PEOPLE'S RIGHTS NETWORK, a political organization, | |
| Defendants. | |

St. Luke's Health System, Ltd. ("SLHS"), St. Luke's Regional Medical Center, Ltd.

("SLRMC"), Chris Roth ("Mr. Roth"), and Dr. Natasha D. Erickson ("Dr. Erickson"),

collectively "St. Luke's Parties" or "Plaintiffs") by and through their counsel, Holland & Hart,

LLP, hereby bring this Complaint against Ammon Bundy ("Bundy"), Ammon Bundy for

Governor ("Bundy Campaign"), Diego Rodriguez ("Rodriguez"), Freedom Man Press LLC

ST. LUKE'S COMPLAINT AND DEMAND FOR JURY TRIAL - 1

## Exhibit Q: Court Document – Default Judgment

Filed: 08/29/2023 09:37:22
Fourth Judicial District, Ada County
**Trent Tripple, Clerk of the Court**
By: Deputy Clerk - Nelson, Ric

### IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE

### STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

|  |  |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD; CHRIS ROTH, an individual; NATASHA D. ERICKSON, MD, an individual; and TRACY W. JUNGMAN, NP, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> AMMON BUNDY, an individual; AMMON BUNDY FOR GOVERNOR, a political organization; DIEGO RODRIGUEZ, an individual; FREEDOM MAN PRESS LLC, a limited liability company; FREEDOM MAN PAC, a registered political action committee; and PEOPLE'S RIGHTS NETWORK, a political organization and an unincorporated association, <br><br> Defendants. | Case No. CV01-22-06789 <br><br> **DEFAULT JUDGMENT** |

JUDGMENT IS ENTERED AS FOLLOWS:

1.     Judgment is entered in favor of Plaintiffs St. Luke's Health System, Ltd.; St. Luke's

Regional Medical Center, Ltd.; Chris Roth, Natasha D. Erickson, M.D.; and Tracy W. Jungman,

N.P. against Defendants Ammon Bundy, Ammon Bundy for Governor, Diego Rodriguez,

Freedom Man Press LLC, Freedom Man PAC, and People's Rights Network.

DEFAULT JUDGMENT - 1

2.    St. Luke's Health System, Ltd.'s and St. Luke's Regional Medical Center, Ltd.'s

damages are awarded against Defendants Ammon Bundy, Ammon Bundy for Governor, Diego

Rodriguez, Freedom Man Press LLC, Freedom Man PAC, and People's Rights Network jointly

and severally in the amount of **Nineteen Million One Hundred Twenty-Five Thousand Dollars**

**[Fourteen Million One Hundred Twenty-Five Thousand ($14,125,000) in compensatory**

damages and **Five Million Dollars ($5,000,000) in punitive damages]**.

3.    Previously Court-ordered and unpaid attorneys' fees and costs of St. Luke's Health

System, Ltd. and St. Luke's Regional Medical Center, Ltd. are awarded against:

    a.    Defendant Ammon Bundy in the amount of **Thirteen Thousand Four Hundred**
        **Forty-Three Dollars and Twenty-One Cents ($13,443.21);**

    b.    Defendant Ammon Bundy for Governor in the amount of **Six Thousand Eight**
        **Hundred Ninety-Five Dollars and Eighty-Six Cents ($6,895.86);**

    c.    Defendant Diego Rodriguez in the amount of **Twenty-Two Thousand Eight**
        **Hundred Fifty Dollars and Seventy-Seven Cents ($22,850.77);**

    d.    Defendant Freedom Man Press LLC in the amount of **Eight Hundred Ninety-Two**
        **Dollars and Twenty Cents ($892.20);**

    e.    Defendant Freedom Man PAC in the amount of **Eight Hundred Ninety-Two**
        **Dollars and Twenty Cents ($892.20); and**

    f.    Defendant People's Rights Network in the amount of **Eight Thousand Three**
        **Hundred Thirty-One Dollars and Ninety-Six Cents ($8,331.96).**

4.    Chris Roth's damages are awarded against Defendants Ammon Bundy, Ammon

Bundy for Governor, Diego Rodriguez, Freedom Man Press LLC, Freedom Man PAC, and

People's Rights Network jointly and severally in the amount of **Eight Million Five Hundred**

**Thousand Dollars ($8,500,000) [Two Million One Hundred Twenty-Five Thousand Dollars**

DEFAULT JUDGMENT - 2

($2,125,000) in compensatory damages and **Six Million Three Hundred Seventy-Five Dollars ($6,375,000)** in punitive damages].

5.    Natasha Erickson's damages are awarded against Defendants Ammon Bundy, Ammon Bundy for Governor, Diego Rodriguez, Freedom Man Press LLC, Freedom Man PAC, and People's Rights Network jointly and severally in the amount of **Twelve Million One Hundred Twenty-Five Thousand Dollars ($12,125,000)** [**Five Million One Hundred Twenty-Five Thousand Dollars ($5,125,000)** in compensatory damages and **Seven Million Dollars ($7,000,000)** in punitive damages].

6.    Tracy Jungman's damages are awarded against Defendants Ammon Bundy, Ammon Bundy for Governor, Diego Rodriguez, Freedom Man Press LLC, Freedom Man PAC, and People's Rights Network jointly and severally in the amount of **Twelve Million One Hundred Twenty-Five Thousand Dollars ($12,125,000)** [**Five Million One Hundred Twenty-Five Thousand Dollars ($5,125,000)** in compensatory damages and **Seven Million Dollars ($7,000,000)** in punitive damages].

7.    Interest shall accrue on all awarded damages bearing the statutory rate of 10.250% per annum until paid in full.

8.    Defendants Ammon Bundy, Ammon Bundy for Governor, Diego Rodriguez, Freedom Man Press LLC, Freedom Man PAC, and People's Rights Network are PERMANENTLY ENJOINED as follows:

      a.    Defendants must cease posting and disseminating defamatory statements against all Plaintiffs. Defamatory statements include:

            i.    The Infant was perfectly healthy when taken by Child Protective Services.

            ii.    St. Luke's made the Infant sick and infected the Infant with disease.

DEFAULT JUDGMENT - 3

iii.   The Infant was kidnapped or unlawfully taken by law enforcement or St. Luke's.

iv.   St. Luke's, St. Luke's management, law enforcement, Idaho Department of Health and Welfare, the courts, and medical practitioners are all involved in a conspiracy to engage in criminal child trafficking, kidnapping children and stealing children to make money.

v.   The medical providers are pedophiles who want to abuse children and engage in child trafficking.

vi.   Idaho Department of Health and Welfare makes more money for every child it takes into Child Protective Services custody and that is why the Idaho Department of Health and Welfare kidnaps and traffics children and only allows certain people with a specific sexual orientation to adopt children.

vii.   St. Luke's and the medical practitioners intentionally or negligently harmed or injured the Infant, committed medical malpractice and/or misdiagnosed the Infant.

viii.   St. Luke's reported the parents to Child Protective Services.

ix.   Dr. Erickson threatened to file a report with Child Protective Services if the parents did not agree to the treatment plan between March 1-4, 2022.

x.   St. Luke's intentionally kept the Infant longer than necessary in the hospital because the parents did not want the Infant vaccinated.

DEFAULT JUDGMENT - 4

xi.    The family was discriminated against because the Infant was not vaccinated.

xii.    The parents have thousands of dollars in medical bills they have to pay based on the care provided by St. Luke's or any medical provider.

xiii.    The parents did not consent to the medical treatment provided to the Infant.

xiv.    The Infant was released from the St. Luke's Children's Hospital and returned directly to the family due to the protestors' or Defendants' actions.

b.    Defendants must cease making statements that any of the Plaintiffs are criminals and/or are participating in unlawful child kidnapping, child trafficking, child sexual or any other child abuse, and/or killing of children.

c.    Defendants must remove from all online locations or websites Defendants have authority to do so any and all statements that the Plaintiffs are criminals and/or participating in the child kidnapping, child trafficking, child sexual or any other child abuse, and/or killing of children. The online locations include, but are not limited to, the following websites including their sub-pages:

https://www.peoplesrights.org, https://www.votebundy.com,

https://www.freedomman.org, https://stlukesexposed.com,

https://www.facebook.com/SaveBabyCyrus/,

https://www.youtube.com/@RealAmmonBundy, https://twitter.com

(handle @RealABundy), https://x.com (handle @RealABundy),

DEFAULT JUDGMENT - 5

https://www.givesendgo.com/GAZAG?utm_source=sharelink&utm_medi
um=copy_link&utm_campaign=GAZAG.

d.     Defendants must cease disseminating and encouraging others to
disseminate the contact information, personal information, and images of
Mr. Roth, Dr. Erickson, and NP Jungman.

e.     Defendants must remove from all online locations and websites Defendants
have authority to do so the contact information, personal information,
and/or images of Mr. Roth, Dr. Erickson, and NP Jungman.  The online
locations include, but are not limited to, the following websites including
their sub-pages:

https://www.peoplesrights.org, https://www.votebundy.com,

https://www.freedomman.org, https://stlukesexposed.com,

https://www.facebook.com/SaveBabyCyrus/,

https://www.youtube.com/@RealAmmonBundy, https://twitter.com
(handle @RealABundy), https://x.com (handle @RealABundy),

https://www.givesendgo.com/GAZAG?utm_source=sharelink&utm_medi
um=copy_link&utm_campaign=GAZAG.

f.     Defendants must deactivate links to defamatory statements or statements
that invade the privacy of the Plaintiffs by portraying them in a false light.

IT IS SO ORDERED.

DATED: _5/29/2023_

_____
NANCY A. BASKIN
District Court Judge

DEFAULT JUDGMENT - 6